COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

December 30, 2014

Robert W. Mallard, Esquire
Dorsey & Whitney (Delaware) LLP
300 Delaware Avenue, Suite 1010
Wilmington, DE  19801

Danielle Gibbs, Esquire
Young Conaway Stargatt
    & Taylor, LLP
1000 North King Street
Wilmington, DE  19801

Re:   *Prokupek v. Consumer Capital Partners LLC*
       C.A. No. 9918-VCN
       Date Submitted:  September 22, 2014

Dear Counsel:

Plaintiff David Prokupek ("Prokupek" or the "Plaintiff") seeks to inspect

certain financial documents of Defendant Smashburger Master LLC

("Smashburger" or the "Company").[1]  His demand arises in the context of a dispute

over the amount that Smashburger owes him because of its redemption of his units

in the Company.[2]

---

[1] Plaintiff voluntarily dismissed the Verified Complaint for Inspection of Business Records (the "Complaint") as against Consumer Capital Partners LLC, which was initially the first-named defendant.
[2] Smashburger has filed a related action in this Court dealing with valuation of those units. *Smashburger Master LLC v. Prokupek*, C.A. No. 9898-VCN.

Whether Prokupek may inspect Smashburger's business and financial records depends on (i) whether he was a member of the Company, with concomitant inspection rights pursuant to Smashburger's LLC Agreement or the Delaware Limited Liability Company Act (the "LLC Act"),[3] when he made his demand and (ii) whether, because he was at least once a member, that status provides him with certain inspection rights.

## I. BACKGROUND

A. *Prokupek's Interest in Smashburger*

Prokupek served as Smashburger's Chairman and Chief Executive Officer ("CEO") until his termination "without cause" on February 3, 2014.[4] Smashburger is a Delaware limited liability company that franchises fast-casual hamburger restaurants. In addition to holding office with the Company, Prokupek owned a substantial amount of Smashburger's equity. The rights of Smashburger's equity

---

[3] 6 *Del. C.* ch. 18.

[4] The facts are drawn from the Complaint, exhibits attached to and incorporated into the Complaint, and the Stipulation and Order Regarding Case Schedule (the "Stipulation").

holders are governed by the Sixth Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[5]

Some of Prokupek's equity was obtained subject to two agreements entered into on June 25, 2013: the Restricted Unit Agreement[6] and the Unit Option Agreement.[7] Pursuant to the Restricted Unit Agreement, Smashburger granted him 667,527 restricted Class B Units ("Units"). Slightly under one-third of those Units immediately vested. The rest would only vest if Smashburger met certain "performance hurdles." The Restricted Unit Agreement provided for five performance hurdles and reaching each was contingent on Smashburger's achieving a certain level of EBITDA.

Prokupek also received options under the Unit Option Agreement, which provided him a potential right to acquire an additional 235,728 Units at an exercise price of $6.58 per Unit. However, the majority of those options would only vest on the same conditions as laid out in the Restricted Unit Agreement.

---

[5] Compl. Ex. 1 (LLC Agmt.).
[6] Compl. Ex. 2 (Restricted Unit Agmt.).
[7] Compl. Ex. 3 (Unit Option Agmt.).

B. *Smashburger Calls Prokupek's Units*

In late November 2013, Smashburger informed Prokupek that it would be ending his employment as of December 23, 2013. He ultimately remained with the Company until February 3, 2014, when Smashburger terminated him "without cause."

On April 18, 2014, Smashburger informed Prokupek (the "First Call Notice") that

> pursuant to Section 8.7(b) of the LLC Agreement, the Company is hereby exercising the Terminated Member Call to redeem 1,039,900 of the Class B Units owned by you. The Company has determined that Company Fair Market Value for all of the Units subject to this Terminated Member Call, as determined in accordance with the LLC Agreement, is $6,842,542.00.[8]

Smashburger valued Prokupek's Units at $6.58 each and indicated that the redemption would close "on Friday, April 25, 2014 at 10:00 a.m. in the Second Floor Public Conference Room, 3900 East Mexico Avenue, Suite 215[,] Denver, CO 80210." On April 25, Smashburger issued and delivered to Prokupek a check in the amount of $307,001.18. According to the Company, Prokupek retained

---

[8] Stip. Ex. 1.

179,632 unvested Units, which had failed to vest under the Restricted Unit Agreement, and 39,288 vested but unexercised options.[9]

On May 6, 2014, Smashburger issued a second Terminated Member Call (the "Second Call Notice") with respect to the 39,288 Units issued upon Prokupek's exercise of his vested option rights.[10] On May 9, 2014, the day identified as closing in the Second Call Notice, Smashburger issued and delivered to Prokupek a check in the amount of $86,171.68.

Prokupek disagreed with Smashburger's valuation of $6.58 per Unit. He had retained an investment banking firm that had valued his Units at $36.93 each. According to him, the Company intentionally manipulated its financials so that (i) it would appear to have fallen short of the fourth and fifth performance hurdles under the Restricted Unit and Unit Option Agreements and (ii) it could justify undercompensating him for his Units.

---

[9] Smashburger was not obligated to redeem unvested Units because Section 7.1.5 of the Restricted Unit Agreement provides, "a Participant shall not be entitled to any privilege or right of unit ownership as to any Class B Units that have not become vested and held of record by the Participant on the books of the Company."

[10] Stip. Ex. 2.

C. *Current Proceedings*

On June 11, 2014, Prokupek sent a letter through counsel to Smashburger, demanding that it provide him with documents from specific categories of business and financial records. Prokupek based his demand on Section 18-305(a) of the LLC Act and the LLC Agreement. His stated purpose was to evaluate Smashburger's financial performance, which (i) determines how many Units vested under the Restricted Unit Plan and (ii) impacts the proper valuation of his Units.

On June 23, 2014, Smashburger refused Prokupek's request. Two days later, Prokupek reiterated his demand. However, Smashburger asserts that it had already redeemed all of Prokupek's Units, thus terminating his status as a member of Smashburger and precluding him from properly demanding inspection. It further argues that former members have no standing to demand inspection under either the LLC Act or the LLC Agreement. Accordingly, it has moved to dismiss

the Complaint pursuant to Court of Chancery Rule 12(b)(6) for Prokupek's lack of standing.[11]

Because the Court can conclude that Prokupek was no longer a member of Smashburger when he demanded inspection and Delaware law does not provide pertinent inspection rights to former LLC members, Smashburger's Motion to Dismiss is granted.

## II. ANALYSIS

A. *Standard for Dismissal under Rule 12(b)(6)*

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court takes well-pled factual allegations in the complaint as true and draws all reasonable inferences in favor of the nonmoving party.[12]  A motion will be granted if, despite these interpretive benefits, the Court concludes that the "plaintiff would not be entitled to recover under any reasonably conceived set of circumstances

---

[11] "[W]here, as here, the issue of standing is so closely related to the merits, a motion to dismiss based on lack of standing is properly considered under Rule 12(b)(6)." *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285-86 (Del. 2007).  In its motion, Smashburger does not otherwise challenge Prokupek's purpose for seeking inspection.

[12] *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *4 (Del. Ch. June 13, 2008).

susceptible of proof."[13]  However, the Court "need not accept every interpretation of the allegations proposed by the plaintiff; instead, [it] will accept those reasonable inferences that logically flow from the face of the complaint."[14] Conclusory allegations unsupported by specific factual allegations have no force.[15]

While the Court's analysis is generally confined to the pleadings, it may consider documents that are integral to the plaintiff's claim and incorporated into the complaint.[16]  If the complaint refers to part of an extrinsic document, the Court may consider the document in its entirety.[17]

B. *Prokupek Was Not a Member of Smashburger When He Made His Demand*

While Plaintiff argues that he retains Unit-holder rights under the LLC Agreement and the LLC Act, the issues that he frames as factual disputes are fundamentally matters of contract interpretation.  "Under Delaware law, questions of contract interpretation can be pure questions of law that are appropriate to

---

[13] *Id.* (internal quotation marks omitted).

[14] *Id.* (internal quotation marks omitted).

[15] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[16] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

[17] *White v. Panic*, 783 A.2d 543, 547 n.5 (Del. 2001).

consider on a motion to dismiss."[18]  However, if two opposing interpretations are reasonable, the Court may not choose between them at this preliminary stage. "The proper application of ambiguous contract provisions is a question of fact that cannot be determined on a motion to dismiss."[19]

Plaintiff claims that he retains equity in Smashburger because the Company (i) paid too little for his Units and (ii) even if the Company had tendered the correct price, it did not call approximately 180,000 of his Units.  Because Smashburger's numbers were allegedly incorrect, Plaintiff maintains that he still owns Units in the Company.  Accordingly, he allegedly remains a member, with concomitant inspection rights.

However, the purchase price that Smashburger tendered and the number of Units that it called are undisputed facts.  Whether Smashburger properly called all of Plaintiff's Units, or paid him adequate consideration, are questions that cannot be answered without reference to the LLC Agreement, the Restricted Unit

---

[18] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *8 (Del. Ch. May 5, 2010).

[19] *Id.*

Agreement, and the Unit Option Agreement.[20]  While the Court must accept Plaintiff's factual allegations as true, it need not blindly credit his legal conclusions.

1. The LLC Agreement

Section 8.7(b) of the LLC Agreement allows Smashburger to call and redeem all of an employee-member's Units when the employee is terminated.

> Upon or at any time after an employee of the Company . . . who is a Member . . . is no longer employed by . . . the Company[,] . . . the Company may call and exercise the right to redeem all, but not less than all, of the Units . . . owned by the Terminated Member . . . at a price equal to (i) Fair Market Value . . . .

Fair Market Value is "the value that would be obtained for the applicable asset in an arm's length sale for cash between an informed and willing purchaser and an informed and willing seller, neither being under any compulsion to buy or sell, *determined by the Manager*."[21]  The Manager is "the Person(s) designated as

---

[20] These documents are considered on this motion because they are "integral to [Plaintiff's claim], referred to throughout the Complaint, and attached to the Complaint as . . . exhibit[s]." *Schuss*, 2008 WL 2433842, at *4.

[21] LLC Agmt. Definition W (emphasis added).

Manager under the terms of [the LLC Agreement]. Icon Burger Development

Company LLC ("IBDC") shall be the initial Manager."[22]

Section 8.7(b) further provides

The redemption of these Units by the Company shall close at the time and place set forth in the written notice by the Company to the Terminated Member of its Exercise of the Terminated Member Call, but no later than sixty (60) days from the date of such notice. The Company shall pay the purchase price of the Units acquired, in the sole discretion of the Company, either in cash at closing, or in three equal annual installment payments . . . with the first payment due at closing . . . .

The parties do not dispute that Prokupek was an employee-member of

Smashburger and that he was terminated in early 2014. As discussed *supra*,

Section I. B., Smashburger exercised the Terminated Member Call on April 18,

2014. On that date, IBDC sent Prokupek a letter on Smashburger's behalf,

indicating that the Fair Market Value of Prokupek's Units subject to redemption

was $6,842,542.00.[23] In accordance with 8.7(b), the First Call Notice specified the

time and place for the closing of the redemption and stated that Smashburger

---

[22] *Id.* Definition BB.

[23] As the designated Manager under the LLC Agreement, IBDC was responsible for certifying whether the Company had achieved the performance hurdles under the Restricted Unit Agreement and the Unit Option Agreement.

would pay the purchase price in three equal annual installments. On April 25, 2014, the date for closing, Smashburger issued and delivered to Prokupek a check for $307,001.18.

On May 6, 2014, Smashburger sent the Second Call Notice, calling Units totaling a Fair Market Value of $258,515.04, with May 9 set for closing.[24] On May 9, Smashburger tendered to Prokupek an $86,171.68 check. According to Smashburger, the two call notices called all of Prokupek's Units and terminated his status as a member.[25] Prokupek argues that the attempted notices were defective because they did not call all of his Units and paid too little for the Units that were called.

---

[24] Unlike the First Call Notice, this notice did not explicitly state the time and place for closing. However, closing was set for May 9, 2014, immediately upon the issuance of the Units being redeemed.

[25] Prior to the calls, Prokupek was a Class B Member, defined in the LLC Agreement as "a Member who holds Class B Units." LLC Agmt. Definition J. Plaintiff suggests that the LLC Agreement does not require unit ownership as a prerequisite to membership. However, it is clear that one is no longer a Class B Member once all of his Units are redeemed.

2. The Restricted Unit Agreement

The first alleged flaw in Smashburger's calls was its failure to call all of Prokupek's Units. Prokupek claims to own 179,632 Units that Smashburger never attempted to redeem. Those Units represent 26.91% of the 667,527 Units granted to him under the Restricted Unit Agreement that were to vest if the Company achieved the fourth and fifth performance hurdles. Prokupek believes that the Company would have met those hurdles had it not improperly made one-time adjustments and reclassifications to its fourth quarter financials.

While there is no dispute that those 179,632 Units were never redeemed, under the Restricted Unit Agreement, Units vest "upon the Administrator certifying that the Company has achieved the applicable performance hurdles." The Administrator "means the Manager or one or more committees appointed by the Manager or another committee . . . to administer all or certain aspects of [the Restricted Unit Agreement]."[26] IBDC, as Manager, served as Administrator and determined that Smashburger never reached the fourth or fifth performance hurdles. Therefore, IBDC determined that 179,632 Units never vested and did not

---

[26] Restricted Unit Agmt. § 2.1.

need to be called.[27]   Whether Smashburger's EBITDA figures, which impact whether it met performance hurdles, were unreliable is a separate factual question that does not change this result.

In other words, Smashburger's First and Second Call Notices were facially valid exercises of its redemption power.  Prokupek may have legitimate concerns that he was undercompensated, perhaps intentionally.   His allegations of insufficient value may potentially be brought in an action seeking damages for breaches of contract.[28]   However, that damages might ultimately be forthcoming does not prevent the Court from concluding that Prokupek was no longer a member of Smashburger when he demanded inspection.[29]

3.  Section 8.8 of the LLC Agreement

Plaintiff argues that even if Smashburger called all of his Units, its calls were nonetheless defective because the Company paid less than Fair Market Value.

---

[27] *See id.* § 5.3.2.  An employee's unvested Units are cancelled as of the date of his termination.

[28] Prokupek has in fact asserted such counterclaims in the related action that Smashburger brought to this Court.

[29] By exercising the Terminated Member Call, Smashburger became obligated to "redeem all, but not less than all" of Prokupek's Units.

He claims to retain his Units pending a Fair Market Value determination pursuant to Section 8.8 of the LLC Agreement, which provides a dispute mechanism "[f]or purposes of determining Fair Market Value . . . [if] a Terminated Member does not agree with the Company's determination." Under that section, a former employee whose Units are called can object to Smashburger's determination of Fair Market Value within thirty days of the Company's call notice. The former employee and the Company then have fifteen days to agree on the Fair Market Value. If unsuccessful, the parties must retain a mutually acceptable independent firm to value the Company. The independent firm's valuation is due within thirty days of its appointment. Section 8.8 thus provides a window of up to seventy-five days from Smashburger's initial Fair Market Value determination to resolve a valuation dispute.

Prokupek argues that because he has invoked Section 8.8, Smashburger can only purchase his Units once a price is determined pursuant to that section. Smashburger contends that a redemption may close pursuant to section 8.7(b)

despite the existence of a valuation dispute— Section 8.8 applies to debates over whether additional money is owed after redemption has closed.[30]

"In deciding a motion to dismiss, [this Court] cannot choose between two differing reasonable interpretations of ambiguous provisions. . . . Ambiguity exists when the provisions in controversy are reasonably or fairly susceptible of different interpretations."[31] However, in considering whether a contract contains ambiguity, the Court must recognize accepted principles of contract interpretation.

---

[30] Prokupek argues that Smashburger's interpretation of the LLC Agreement would allow the Company to call all of a former employee's Units for the arbitrary price of a dollar, send that single dollar to the former member, and thereby divest him of his rights as a Unit holder.

As a preliminary matter, Smashburger's valuation was not necessarily arbitrary—even if it undervalued Prokupek's Units, it was at least based on historical financials. More importantly, this Court has recognized that a unit holder may lose his equity-related rights when a limited liability company redeems his shares in accordance with its operating agreement, despite conceivable claims that the company valued the units in bad faith. *See Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *11 (Del. Ch. Aug. 30, 2013).

In *Stewart*, the Court determined that the plaintiff no longer had rights as an LLC member after the company redeemed his units, despite the fact that the company paid nothing for the units. Plaintiff could still bring a claim alleging bad faith, but the adequacy of the price paid was an issue separate from whether stock had been effectively redeemed pursuant to the operating agreement.

[31] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (internal quotation marks omitted).

"Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[32]

When read in relation to Section 8.7(b), Section 8.8 cannot reasonably be interpreted so as to delay a redemption's closing until the "dispute mechanism" procedure is complete. Section 8.7(b) is clear: the redemption of all Units called "shall close at the time and place set forth in the written notice by the Company to the Terminated Member of its exercise of the Terminated Member Call, but no later than sixty (60) days from the date of such notice." Section 8.7 provides no exception for ongoing disputes pursuant to Section 8.8. Further, disputes under Section 8.8 may take up to seventy-five days (or even longer in practice) from the date of Smashburger's determination of Fair Market Value to resolve, while closing under Section 8.7 must occur within sixty days. The only way to give effect to both contractual provisions, without altering the LLC Agreement's

---

[32] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

express terms, is to recognize that valuation disputes may continue after a member's Units have been validly called.[33]

Even if Prokupek retained rights as an equity holder for a period of time after Smashburger sent redemption notices, he was divested of his rights no later than May 9, 2014, the closing date specified in the Second Call Notice. While Prokupek may have damages claims related to the two closings, any recovery will be monetary, not restoration of an equity interest in Smashburger.

C. *Prokupek's Status as a Former Smashburger Member Does Not Provide Him with Statutory Inspection Rights*

Section 18-305(a) of the LLC Act provides inspection rights to "[e]ach member of a limited liability company."[34] Section 18-305's corporate analogue,

---

[33] Prokupek's argument that as an equity holder, he retains legal title to his Units until the purchase price is paid is also contradicted by Section 8.7 which allows Smashburger to pay the purchase price in three equal installments, with the last installment on the second anniversary of closing. It would not be reasonable to conclude that a terminated employee continues to possess Unit holders' rights for two years after the Company closes on the redemption of his Units.

[34] Prokupek makes no argument that Section 6.2 of the LLC Agreement, which governs members' access to records and accounting, provides inspection rights to former members. Because of the "considerable deference to and lack of restriction upon the terms of [an LLC's] governing instrument . . . all of the rights afforded to interest holders under [Section 18-305] are made subject to such reasonable

8 *Del. C.* § 220, provides guidance on its scope.[35] Section 220 "plain[ly] and unambiguous[ly]" limits inspection rights to current stockholders and directors.[36] The Court narrowly construes Section 220 in contrast to "other states [that] have conferred limited books and records inspection rights on former directors."[37] Nothing in Delaware case law "suggests . . . such a broad reading of Section 220(d)[;] . . . if the General Assembly intended to confer Section 220(d) inspection rights on former directors, it could have done so in the statute, but it did

---

standards as may be set forth in the agreement." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 8.06[a][2], at 8-116 (2014).

[nbsp] The effect that Section 6.2 might have on altering Section 18-305(a)'s default rights can be ignored here because Section 18-305 fails to provide Prokupek with inspection rights regardless of any potential limitations on its application.

[35] Because of the relative lack of guiding precedent in the LLC context, "the Court may look to cases interpreting similar Delaware statutes concerning corporations and partnerships." *Somerville S Trust v. USV P'rs, LLC*, 2002 WL 1832830, at *5 n.4 (Del. Ch. Aug. 2, 2002).

[36] *See King v. DAG SPE Managing Member, Inc.*, 2013 WL 6870348, at *6 (Del. Ch. Dec. 23, 2013).

[37] *Id.*

not."[38]  A Delaware director's right to inspect corporate books and records under

Section 220(d) thus ends upon his removal from office.[39]

By its plain language, Section 18-305(a) of the LLC Act confers inspection

rights only on current members of an LLC.  Plaintiff has cited no Delaware

authority holding that former members retain residual inspection rights under the

statute.  While Plaintiff was recently a member of Smashburger and believes that

he has a proper purpose in making his demand, these circumstances do not justify

stretching the LLC Act's plain language in order to find standing.  As noted,

Section 220 is strictly construed in the corporate context.  If Prokupek had been a

former stockholder in a Delaware corporation, he could not have properly

demanded inspection or brought a Section 220 action.  Given that "LLC

agreements can grant members inspection rights that exceed the rights provided for

---

[38] *Id.*

[39] *Id.*  Further, in the stockholder Section 220 demand context, standing is determined as of the time that a stockholder makes demand. *See Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *7 (Del. Ch. July 13, 2005) ("[Plaintiff] has established that it was a stockholder at the time of its demand and therefore has standing to maintain this action.").

in the statute,"[40] there is no reason to expand the LLC Act's plain language when the parties refrained from doing so themselves.[41]

### III.  CONCLUSION

Because Prokupek was not a member of Smashburger when he made his demand and because his status as a former member provides no current right to inspect the Company's business records, Smashburger's Motion to Dismiss is granted.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:     Register in Chancery-K

---

[40] *Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 2244608, at *1 (Del. Ch. July 28, 2009).

[41] It may be worth noting that when a beneficial, but not record, stockholder demands inspection pursuant to 8 *Del. C.* § 220, a failure to attach documentary evidence of beneficial ownership mandates dismissal of the inspection demand. *See, e.g.*, *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 141 (Del. 2012).  While this is a statutory requirement, it reflects a policy carefully guarding who may properly demand inspection.  In the alternative entity context, inspection rights should not be unduly expanded beyond plain contractual and statutory language.