**NAMA HOLDINGS, LLC, Plaintiff,**

v.

**WORLD MARKET CENTER
VENTURE, LLC,
Defendant.**

**C.A. No. 2756–VCL.**

Court of Chancery of Delaware,
New Castle County.

Submitted: June 5, 2007.
Decided: July 20, 2007.

visions, however, illustrates that the defendant, as one of the managing members of the LLC, retains substantial discretion to determine the scope and conditions of the investor's access, and enjoys the power to limit the classes of documents available and to insist upon the investor's execution of an appropriate confidentiality agreement before such access is granted. Therefore, with one minor exception, the court concludes that the managing member has acted within its contractual mandate thus far by preventing the investor from obtaining documents that have the potential to damage the LLC's interests if misappropriated or misused.

Michael D. Goldman, Esquire, Stephen C. Norman, Esquire, Abigail M. LeGrow, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE; Howard J. Rubinroit, Esquire, Ronald C. Cohen, Esquire, Sidley Austin, LLP, Los Angeles, CA, for the Plaintiff.

Allen M. Terrell, Esquire, Lisa Zwally Brown, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE; Leslie D. Corwin, Esquire, Sophia Tsokos, Esquire, Greenberg Traurig, LLP, New York City, for the Defendant.

### OPINION

LAMB, Vice Chancellor.

A disgruntled investor, who owns an indirect interest in a Delaware limited liability company, brings an action to inspect that entity's books and records pursuant to contractual provisions in the organizational document of the LLC which, the investor believes, grant it an unrestricted right of access to sensitive and proprietary information concerning the entity's operations. A proper reading of those contractual pro-

## I.

### A. The Parties

The plaintiff is NAMA Holdings, LLC, a limited liability company organized under Nevada law. Nigel Alliance and Mousa Alliance are NAMA's principals. The defendant is World Market Center Venture, LLC, a Delaware limited liability company ("Venture").

### B. The Facts

#### 1. The Parties' Relationship

This case involves the World Market Center ("WMC"), a multi-phase real estate development project in downtown Las Vegas, Nevada. The site is an extensive 57–acre showroom and convention complex that caters to the home furnishings industry. Twice a year, WMC hosts the Las Vegas Market, an international trade show for retail furniture and design merchants.

WMC is owned and operated by Venture. Venture is jointly owned and jointly managed by two entities: Related World Market Center, LLC ("Related") and Network World Market Center, LLC ("Network"), both Delaware limited liability

companies. Network is wholly owned by Alliance Network Holdings, LLC ("Alliance Holdings"). Alliance Holdings is wholly owned by Alliance Network, LLC ("Alliance Network"). NAMA is the principal investor in Alliance Network, having contributed approximately 70% of that entity's initial capital. During the time period of Alliance Network's formation, Crescent Nevada Associates, LLC ("Crescent") and Prime Associates Group, LLC ("Prime") became its minority owners, respectively holding about 20% and 10% of the company's equity.

Prime has two 50% owners: Shawn Samson and Jack Kashani. As originally drafted, the manager-managed operating agreement of Alliance Network (the "Alliance Operating Agreement") provided that Samson and Kashani were to act as Alliance Network's co-managers. Their joint consent was required for the implementation of any managerial decision. However, NAMA, as the majority member of Alliance Network, possessed veto rights over certain major decisions, including project financing and the purchase or sale of real property.

Alliance Network acted as the sole owner of WMC for several years. In 2003, however, a search began for additional investors to help fund future phases of the project, partly as a result of NAMA's refusal to contribute any more capital to the endeavor. The Related Companies, a major real estate developer, expressed interest in the business, and subsequently formed Related in order to join with Alliance Network in operating WMC. To that end, Venture was created to own, operate, and develop WMC.

Venture is governed by the amended and restated operating agreement of World Market Center Venture (the "Venture Agreement"), which provides Related, in exchange for a substantial amount of capital, with a one-third equity interest in the first phase of WMC and a one-half interest in all future phases of the project. Upon execution of the Venture Agreement, the equity interest of Alliance Network in WMC, through its 100% stake in Network, was reduced accordingly. Around this same time, the Alliance Operating Agreement was significantly amended to eliminate NAMA's veto rights over Alliance Network. Those veto rights were unacceptable to Related, which wanted to have, along with Samson and Kashani (as the co-managers of Alliance Network), unfettered discretion over financing the project and allowing new members to invest in future phases of WMC. NAMA conceded, and, in return, obtained certain rights of inspection and access to Venture's books and records, the nuances of which form the basis of the present dispute.

### 2. The Nature Of The Industry

As Samson testified at trial, the dynamics of the home furnishings showroom industry are as straightforward as they are cut-throat. For many years, the furniture market in High Point, North Carolina enjoyed a virtual monopoly on providing showroom services. As a result of High Point's long dominance and substantial size, the barriers to market entry are formidable. An entrant must have massive floor space available to accommodate furniture manufacturers, so as to provide retail purchasers with a broad spectrum of product lines from which to choose prospective inventory for the next six months. To provide the necessary showroom area, an enormous amount of capital is required. Upon completion of the first three phases of WMC, investors will have poured approximately $1 billion into the project.

Because WMC's entry into this industry involves substantial monetary risk, its business plan is to develop and expand its

product at a brisk pace to rapidly increase its market share. In a matter of eight years, WMC will have gone from the drawing board to nearly six million square feet of premium showroom space. This rate of expansion is unprecedented in the industry. According to Samson, "[i]t took High Point 100 years to get to ten to twelve million square feet. High Point views [WMC] as a huge threat to an industry that they have controlled for a century."[1]

At trial, Samson painted a picture of High Point as a hawkish competitor, supported by 150 different owners and backed by the State of North Carolina, willing to take whatever steps are necessary to ensure that WMC does not supplant its market dominance. In such an environment, the strict confidentiality of WMC's business records is critical to success. A market entrant's proprietary information such as lease agreements, financing documents, and strategic planning memoranda would be of immeasurable value to an industry leader such as High Point. If not protected, such information could spell disaster for the smaller and less-established newcomer who has narrower operating margins and more limited resources with which to compete. Indeed, Mousa Alliance, during his trial testimony, admitted that this type of information is highly confidential and potentially damaging to WMC if it were to find its way into the wrong hands.[2]

### 3. NAMA Attempts To Exercise Its Inspection Rights

The parties' current dispute began in October 2006, when Related issued a proposed funding notice for phase three of WMC. Shortly thereafter, Prime, acting as the Alliance Network manager, sent a capital call notice to the Alliance Network members. The notice required a $41.5 million investment from NAMA and Crescent if they wished to fully participate in the phase.[3]

NAMA strenuously objected to the capital call. NAMA voiced its belief that Prime wrongfully planned to use a substantial amount of the capital call to collateralize a construction loan, to unnecessarily increase the size of the loan, and then to pay itself bloated management fees from the excess loan proceeds. NAMA also accused Prime of improperly withholding $19 million of proceeds from a loan refinancing that NAMA thought should have been distributed to the Alliance Network members. As a result, the discussions between Kashani, Samson, and Mousa Alliance regarding the capital call became heated, with Alliance eventually threatening to sell his interest in the project to High Point and thereby share WMC's sensitive information with its sole competitor.[4] Despite this contentiousness, NAMA eventually gave notice to Alliance Network that

---

1. Trial Tr. 113.

2. Trial Tr. 156–57 ("I would like to tell the Court if, for the co-managers of WMC, provisions of the lease contracts [are] so important ... and are confidential ... I would not request [these] lease agreements. . . .").

3. NAMA and Crescent had a contractual right under the Alliance Operating Agreement to elect either full participation (a "co-investment election") or partial participation (a "carried interest option") in a new phase of WMC at the beginning of that phase.

4. Trial Tr. 123–24. When his counsel recalled him to the stand, Alliance denied ever making these threats. The court does not find his rebuttal testimony credible, since the notion that Alliance would engage in this type of threat seems typical of the intransigence he displayed on other occasions. Trial Tr. 91–93. Moreover, Alliance's firm refusal to consent to a confidentiality agreement casts suspicion on his primary motive in conducting an inspection. Trial Tr. 123.

it would exercise its co-investment election in phase three.

On November 3, 2006, NAMA informed Kashani and Samson of its intention, pursuant to certain provisions of the Alliance Operating Agreement which are not at issue in this litigation, to inspect the books and records of Alliance Network, Alliance Holdings, and Prime (as well as its subsidiaries and affiliates) at the Alliance Network offices in Beverly Hills, California on November 13, 2006.[5] Later that same day, Kashani and Samson replied that those books and records would be available for review. Additionally, the Alliance Network managers informed NAMA that:

> The books and records of [Venture] and its subsidiaries and affiliates are available for review at [Venture's] principal offices at World Market Center LLC, 495 S. Grand Central Parkway, Las Vegas, NV 89106 in accordance with the [Venture Operating Agreement]. If you would like to inspect those books and records, please provide us with [a list of documents and the names of the individuals conducting the inspection] so we can arrange to accommodate you at those offices. We have scheduled November 13 and 14 in Las Vegas for this purpose.[6]

On November 8, 2006, NAMA informed Kashani and Samson that Bruce Gamble of Alvarez & Marshal Real Estate Advisory Services, as NAMA's authorized representative, would appear in Las Vegas on November 13 to inspect and copy Venture's books and records. NAMA stated that its representative would copy and retain, among other things, lease agreements with tenants, appraisals for all assets owned by Venture, and all communications between Venture and its managers, attorneys, and/or accountants.[7]

Venture immediately expressed concern about NAMA's intentions because, in its view, certain of the information and material sought by NAMA was "highly proprietary," "confidential," and "entitled to trade secret protection."[8] Thus, Venture told NAMA that it intended to "strictly enforce" the contractual provisions governing NAMA's right to inspect its books and records, and that NAMA's right of access was contingent upon execution of a confidentiality agreement.[9] Venture's reply correspondence also indicated that only a principal of NAMA (and not a third-party designee) would be allowed access to Venture's documents, and that copying of any records would be limited. Finally, Venture claimed that Network and Related, as the entity's managing members, were contractually entitled to impose other reasonable limitations upon NAMA's inspection rights.

### 4. *NAMA Sues To Enforce Its Inspection Rights*

When Gamble appeared at Venture's Las Vegas offices on November 13, he was

---

5. JX 2. In its November 3 letter, NAMA made no mention of its intent to invoke its contractual rights to inspect the books and records of Venture as those rights exist under the Venture Agreement.

6. JX 3.

7. JX 4.

8. JX 7.

9. JX 5. The proposed confidentiality agreement provided that neither NAMA nor its representatives could "directly or indirectly *use,* disclose, disseminate, publish, divulge, or otherwise reveal any Confidential Information *for any purpose at any time,*" and required NAMA to return the information, and destroy any notes or memoranda based on such information, at Venture's request. (Emphasis added.) NAMA made no effort to negotiate these terms, and instead flatly rejected the basic concept of a confidentiality agreement. Trial Tr. 123.

refused access to any documents. Despite the November 13 rebuff, NAMA renewed its demand for inspection in December 2006. In letters sent during that month, NAMA took the position that it has an unconditional right to inspection under the Venture Agreement in order "to verify that the respective [WMC] entities and those who are managing them are conducting the business (including, but not limited to, with respect to the use of NAMA's funds) in an honest manner ... and to provide NAMA with information critical to its participation in [WMC]."[10]

In support of its position, NAMA relied upon several interrelated provisions of the Venture Agreement which were specifically included for its benefit.[11] Section 12.18(e) gives NAMA a general right of inspection and provides:

> The members of Alliance Network [i.e. NAMA], each at its sole cost and expense, shall have reasonable access at reasonable times on business days upon prior written notice to the books and records of [Venture] and any of [Venture's subsidiaries] in which Network has a direct, or indirect, interest, in the same manner, to the same extent, and otherwise upon the same terms and conditions as the Members [of Venture] are permitted access to such books and records in accordance with Section 9.1 of this Agreement.[12]

Section 9.1 defines the categories of documents which a member may access:

> The books and records of [Venture] shall be kept, and the financial position and the results of its operations recorded ... by the Managing Members from time to time. The books and records of [Venture] shall reflect all [of Venture's]

transactions and shall be appropriate and adequate for [Venture's] business. The Managing Members shall cause [Venture] to maintain at its principal office all of the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contributions and Capital Account of such Member;

(b) A copy of the Certificate of Formation and any and all amendments thereto together with the executed copies of any powers of attorney to which the same or any amendments thereto have been executed;

(c) A copy of the certificate of formation and any and all amendments thereto together with executed copies of any powers of attorney to which the same or any amendments thereto have been executed for each Project Company;

(d) A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney to which this Agreement or any amendments thereto have been executed;

(e) A copy of the Operating Agreement for each of the other Project Companies and any and all amendments thereto together with executed copies of any powers of attorney to which such Operating Agreement or any amendments thereto have been executed;

(f) Copies of [Venture's] federal, state, and local income tax or information returns and reports, if any, for the five (5) most recent taxable years;

---

10. JX 20.

11. NAMA is not a signatory to the Venture Agreement, but section 12.18(j) explicitly

states that NAMA is a third-party beneficiary of section 12.18 in its entirety.

12. JX 1 at 100.

(g) Copies of the financial statements of [Venture], if any, for the five (5) most recent fiscal years; and

(h) Any of the books and records of the Project Companies as they relate to the internal affairs of the Project Companies, for at least the five (5) then-most recent fiscal years.[13]

Unable to amicably resolve their differing interpretations of the relevant contractual provisions for several months, NAMA filed this suit against Venture on February 27, 2007.[14] NAMA requests that the court enter an order permitting it or its representatives unrestricted access to inspect and copy the books and records of Venture and its subsidiaries. In an April 27, 2007 memorandum opinion, this court denied Venture's motion to dismiss the complaint.[15] A one-day trial was held on May 14, 2007, and the parties submitted post-trial briefing on June 5, 2007.

## II.

NAMA insists that the plain text of section 12.18(e) does not afford Venture any discretion whatsoever, despite Related's and Network's status as the co-managers of the entity, to place limitations on NAMA's right to inspect Venture's books and records. In arguing for what it believes is an unconditional right of access, NAMA claims that its rights of inspection are equivalent to those enjoyed by Venture's managing members. Because Related and Network presently are Venture's only members, and because those two entities have never had any restrictions placed on their access rights, NAMA says that it too is entitled to review any materials ever created for Venture's business or that of

Venture's subsidiaries, not just the documents enumerated in section 9.1 of the Venture Agreement.

Moreover, NAMA argues that this unfettered access necessarily includes a right to copy and remove the books and records, as well a right to designate representatives to execute these tasks on NAMA's behalf. NAMA also claims that it cannot be forced to execute any sort of confidentiality agreement as a predicate to exercising its inspection powers. In sum, NAMA says its contractual right under the Venture Agreement is in no way concomitant, and, indeed, is much broader, than an LLC member's typical statutory right of access, which, NAMA admits, grants an LLC's manager substantial discretion to protect an entity's confidential and sensitive written materials.

In response, Venture also focuses on the plain language of the Venture Agreement. First, Venture claims that NAMA may access only those types of documents specifically enumerated in section 9.1. However, section 9.1, so Venture says, is a contractual ceiling on NAMA's inspection rights. In Venture's view, section 12.18(e) grants Related and Network, as its managing members, the ability to impose reasonable limitations not only upon the types of documents available to NAMA under section 9.1, but also upon the terms and conditions of access to those documents. In support of its position, Venture notes that, subject to an appropriate confidentiality agreement, it always has been willing to provide NAMA with the company's financial statements, tax returns, contribution lists, federal income tax filings, and organizational documents, as well as "any docu-

---

13. JX 1 at 83–84.

14. A related action, *NAMA Holdings, LLC v. Related World Market Center, LLC and World Market Center Venture, LLC*, C.A. No. 2755-VCL (Del. Ch. filed Feb. 27, 2007), was voluntarily dismissed by stipulation of the parties.

15. *See generally NAMA Holdings, LLC v. Related World Market Center, LLC*, 922 A.2d 417 (Del.Ch.2007).

ment that [is] not so sensitive as to rise to the level of [a] trade secret, and any document that [is not protected] by attorney-client privilege."[16]

Venture further argues that the managerial discretion afforded by section 12.18(e) is wholly consistent with the default scheme of informational control codified in 6 *Del. C.* § 18–305(c). Given NAMA's unrelenting quest for highly sensitive information and given Mousa Alliance's threats to make that information available to persons who could damage WMC, Venture says that the restrictions it imposed-both as to the scope of documents available for review, and as to its dictates on a confidentiality agreement, copying, and the use of representatives-were completely reasonable in the circumstances.

## III.

A. *Section 12.18(e) Gives Venture The Authority To Limit NAMA's Inspection Rights In Section 9.1*

■ The legal principles the court must apply to decide this case involve well-settled precepts of contract interpretation under Delaware law.[17] First and foremost in this analysis is that the clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms "establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[18] Indeed, absent contractual ambiguity, a court cannot resort to extrinsic evidence to vary the terms of the agreement or to create uncertainty therein.[19] Ambiguity does not occur simply because the parties disagree about the contract's meaning;[20] rather, a contract is only ambiguous when a disputed provision is "susceptible to two *reasonable* interpretations."[21]

■ Indisputable proof of the unambiguous meaning of section 12.18(e), the operative provision which creates NAMA's right of inspection, is found in the use that provision makes of the words *"reasonable*

**16.** Trial Tr. 118–19.

**17.** *See generally* 6 *Del. C.* § 18–1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); *MHM/LLC, Inc. v. Horizon Mental Health Mgmt., Inc.,* 1996 WL 592719 (Del.Ch. Oct.3, 1996), *aff'd,* 694 A.2d 844 (Del.1997) (applying principles of contract interpretation to the provisions of a limited liability company agreement). The court notes that one of Venture's primary arguments—that the contractual provisions at issue in this litigation should be construed to mirror 6 *Del. C.* § 18–305(c)—is a non-starter. While that statute might be a useful referent to resolve ambiguity, if ambiguity in fact existed, within the relevant provisions, the court cannot allow the statute to overshadow the express contractual agreement the parties reached on inspection rights in this case. *See, e.g., Arbor Place, L.P. v. Encore Opp. Fund, L.L.C.,* 2002 WL 205681, at *4 n. 9

(Del.Ch. Jan. 29, 2002) (discussing precedent that a partnership or LLC agreement can create a contractual inspection right which is broader or narrower than the one created by statute).

**18.** *Multi–Fineline Electronix, Inc. v. WBL Corp.,* 2007 WL 431050, at *6 (Del.Ch. Feb.2, 2007) (citing *Eagle Inds. v. DeVilbiss Health Care,* 702 A.2d 1228, 1232 (Del.1997)).

**19.** *Id.* (citing *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991)).

**20.** *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del. 1993); *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992).

**21.** *Multi–Fineline,* 2007 WL 431050, at *6 (citing *Simon v. Navellier Series Fund,* 2000 WL 1597890, at *7 (Del.Ch. Oct. 19, 2000) (emphasis in original)).

access" to describe NAMA's rights.[22]  Indeed, the emphasis section 12.18(e) places on the concept of reasonableness necessarily implies several logical deductions about the breadth of NAMA's access.  Viewed either conjunctively or in isolation, these deductions fatally undermine NAMA's contention that Venture does not possess the contractual ability to limit both the types of documents NAMA may examine and the terms and conditions upon which such an examination may occur.

■ First, the mere inclusion of the term "reasonable" in section 12.18(e) means that the parties to the contract intended a more restrictive view of NAMA's ability to inspect than the unconditional and mandatory right of access which NAMA advocates.  Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.[23]  If the parties here did not intend to create a reasonableness limitation on NAMA's right of inspection, why would they have included language to that effect in section 12.18(e)?  Tellingly, NAMA makes no attempt to rebut this point, despite the violence it does to NAMA's litigation position.

Second, as a matter of fundamental logic, the use of the term "reasonable" in section 12.18(e) to describe the scope of access NAMA may enjoy with respect to the categories of documents listed in section 9.1 means that the parties contemplated someone making a judgment call as to exactly what limitations constitute "reasonable access."  When the Venture Agree-

ment is viewed in context, it is clear that Related and Network, not NAMA, are the parties charged with this discretionary authority.

As is typical of a manager-managed limited liability company, Network and Related, as Venture's managing members, are vested with both the power and the obligation to do "any and all things necessary, proper, convenient or advisable to manage the assets and affairs of [Venture] in accordance with and subject to the limitations of [the Venture Agreement]. . . . ."[24]  Thus, absent any explicit language in section 12.18(e) stipulating that someone other than Network and Related can determine what constitutes "reasonable access" to Venture's books and records, it is the managing members who have that power and obligation.  Rather than accept the orderly decision-making structure contained in the Venture Agreement, NAMA essentially argues that it, as a third-party beneficiary given no other managerial authority under the contract, has the power to make a unilateral determination of the terms, conditions, and documents that constitute "reasonable access" pursuant to section 12.18(e).  NAMA's interpretation, however, negates, or, at the very least, substantially undermines, the plain meaning of the reasonableness limitation.  Such a discretionary proviso would make little sense if the party charged with determining the reasonableness of an inspection demand was the same party making the demand in the first place.  The contracting parties must have therefore intended that Related and Network, as Venture's managing members, retain the power to make

---

**22.**  Emphasis added.

**23.**  *Majkowski v. American Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del.Ch.2006) (stating that, as a general matter, courts "attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage").

**24.**  JX 1 at 51.

a judgment as to reasonableness under section 12.18(e).

Finally, the court turns to why, in the context of the Venture Agreement, NAMA's argument that it is entitled to the same rights of informational access as the managing members of Venture fails to withstand scrutiny. Throughout, the contract differentiates between "Members" and "Managing Members." Both are defined terms in a contract that specifically contemplates a process by which new Members may be admitted in the future.[25] Related and Network, however, are the defined Managing Members under the agreement, and have extensive duties that ordinary Members, if and when they are admitted, would not.[26] In order to discharge their responsibilities in the best interests of the company, the Managing Members, who are in fact charged with keeping and maintaining Venture's books and records, naturally require access to all of the entity's information. As a matter of simple logic, then, the restriction that section 12.18(e) places on a Member's right to access—namely, allowing a Member to inspect, subject to a reasonableness requirement, those documents listed in section 9.1—cannot apply to the Managing Members whose duties implicitly require unfettered access. Therefore, under a proper reading of the Venture Agreement, section 12.18(e) simply places a limitation on NAMA's and all future Member's rights to access the books and records of Venture, while logically leaving the rights of Related and Network unaltered.

B. *The Limitations Venture Imposed Upon NAMA's Inspection Were, For The Most Part, Reasonable Limitations*

■ Venture's compliance with section 12.18(e) must be evaluated in the context of the unique nature of the facts and circumstances it faced.[27] Venture considered a substantial number of the documents NAMA requested to be confidential. At trial, Mousa Alliance essentially agreed to Venture's assessment as to the sensitivity of this information. Nevertheless, Alliance threatened to copy these records and leak them to High Point, a threat made all the more menacing to Venture by NAMA's staunch refusal to negotiate over the proper scope of a confidentiality agreement, an item that is a virtual *sine qua non* of a books and records inspection conducted of a Delaware entity.[28] In the circumstances,

25. JX 1 at 11 (" 'Member' means each Person who (a) is an initial signatory to this Agreement or has been admitted to the Company as a Member in accordance with this Agreement...."). *See also* JX 1 at 73–78 (discussing the process by which transfer of membership interests may occur).

26. JX 1 at 10 (" 'Managing Members' means Related and Network or any successor to either selected as a Managing Member in accordance with the provisions hereof."). See also JX 1 at 52 ("the Managing Members shall jointly make all Major Decisions on behalf of the Company"); at 52–53 (discussing the degree of skill and care required of the Managing Members); at 56–57 (discussing the types of matters which constitute a "Major Decision"); at 83–85 (discussing the responsibility of the Managing Members to keep and maintain books and records).

27. *See, e.g., In re Lear Corp. S'holder Litig.,* 926 A.2d 94, 2007 WL 1732588, at *20 (Del. Ch. June 15, 2007) (noting the parameters of a reasonableness inquiry in the context of a claim brought pursuant to *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1985), and its progeny).

28. *See, e.g., Stroud v. Grace,* 606 A.2d 75, 89 (Del.1992) (noting that Delaware courts have made "disclosure contingent upon the shareholder first consenting to a reasonable confidentiality agreement"); *Freund v. Lucent Tech.,* 2003 WL 139766, at *7 (Del.Ch. Jan. 9, 2003) (conditioning the inspection of books and records on the execution of a confidentiality agreement).

Venture's efforts to limit the scope of NAMA's inspection to only non-sensitive information, while simultaneously prohibiting photocopying of Venture's books and records and insisting upon the execution of a confidentiality agreement, were all reasonable actions permitted by section 12.18(e).[29]

Unlike Venture's positions with respect to the scope of the inspection, the confidentiality agreement, and the copying limitation, its insistence that Mousa Alliance alone conduct the inspection, rather than a duly-authorized NAMA representative, was unreasonable. In an analogous situation in the corporate context, this court has held that a stockholder who is granted a right of access to the books and records of a corporation pursuant to a stockholder's agreement may utilize "duly constituted agent[s]" such as attorneys, accountants, or clerks to conduct an inspection even though the agreement does not specifically provide for such delegation.[30] As NAMA correctly observes, if inspection rights are to have any substantive force, the party who benefits from them must be able to enlist the sophisticated assistance of attorneys, accountants, and other experts to meaningfully evaluate complex financial information.

In this regard, Venture has failed to substantiate its contention that Gamble has a conflict of interest which should bar him from acting on NAMA's behalf. Gamble represented a former client, Simmons Mattress, in lease negotiations with Venture approximately four years ago.[31] During the course of that engagement, he never obtained any of Venture's confidential information.[32] In the four years since that engagement ended, Gamble has had no contact with Venture's competitors in any capacity.[33] Thus, Venture's make-weight position on this point fails.

## IV.

For the foregoing reasons, the court finds that section 12.18(e) of the Venture Agreement grants Venture the power to impose reasonable terms and conditions upon NAMA's right to inspect the documents listed in section 9.1 of that contract. With the exception of requiring Mousa Alliance to carry out the inspection, Venture has otherwise complied with its contractual obligations thus far by acting reasonably in light of the facts and circumstances it faced. Counsel for Venture is directed to submit a form of final order and judgment, on notice, within ten days.

---

29. The court does note that a proper confidentiality agreement, unlike the one initially proffered by Venture, would allow NAMA to "use" the information contained in any books and records inspected for limited proper purposes.

30. *Ostrow v. Bonney Forge Corp.*, 1994 WL 114807, at *10 (Del.Ch. Apr.6, 1994). *See also* 8 *Del. C.* § 220(b) (providing that a stockholder of a Delaware corporation may conduct an inspection of books and records "in person or by attorney or other agent"); *Somerville S Trust v. USV Partners, LLC,* 2002 WL

1832830, at *5 n. 4 (Del.Ch. Aug.2, 2002) (noting the relevance of looking to Delaware corporate statutes and case law when interpreting similar provisions in an LLC agreement due to the paucity of reported decisions in the LLC context).

31. Trial Tr. 43–44.

32. Trial Tr. 45.

33. Trial Tr. 45–46.