# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE JOHNSON REVOCABLE LIVING TRUST, ALLEN JOHNSON, and LINDA JOHNSON, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DAVIES US, LLC, a Delaware Limited Liability Company, f/k/a DAVIES US, INC., a Delaware Corporation, and DAVIES GROUP LIMITED, an England and Wales Private Limited Company, | ) ) ) ) ) ) | C.A. No.: N22C-03-148 EMD CCLD |
| Defendants. | ) | |

Submitted: December 18, 2023
Decided: March 7, 2024

*Upon Plaintiffs' Motion for Summary Judgment*
**DENIED**
*Upon Defendants' Motion for Summary Judgment*
**GRANTED**

Brett M. McCartney, Esquire, Elizabeth A. Powers, Esquire, Bayard, P.A., Wilmington, Delaware, Robert J. Bartz, Esquire, Joe M. Fears, Esquire, Todd Holman, Esquire, Barber & Bartz APC, Tulsa, Oklahoma. *Attorneys for Plaintiffs The Johnson Revocable Living Trust, Allen Johnson, and Linda Johnson.*

Eric Lopez Schnabel, Esquire, Alessandra Glorioso, Esquire, Dorsey & Whitney (Delaware) LLP, Wilmington, Delaware, Gregory S. Tamkin, Esquire, Dorsey & Whitney LLP, Denver, Colorado, Anthony Badaracco, Esquire, Dorsey & Whitney LLP, New York, New York. *Attorneys for Defendants Davies US, LLC and Davies Group Limited.*

**DAVIS, J.**

## I. INTRODUCTION

This is a breach of contract action assigned to the Complex Commercial Litigation

Division of the Court. This matter involves the Stock Purchase Agreement (the "SPA") entered

between Defendant Davies US LLC f/k/a Davies US Inc. ("Davies US") and certain of the Plaintiffs.[1]

The SPA effected the sale of Johnson Claim Service, Inc. ("JCS"). Plaintiffs were among the sellers, and Davies US was the buyer. The SPA provided that a future sale of the majority of equity ownership or voting power over JCS's stock would require Davies US to pay $1,500,000 in "Accelerated Deferred Compensation." The central issue in this litigation is whether such a sale occurred.

Plaintiffs argue the sale of Davies US's ultimate parent company triggered Davies US's obligation to pay the Accelerated Deferred Compensation. Plaintiffs theorize that because the SPA's definition of a "Change of Control Event" included the phrase "directly or indirectly," the sale of any of the entities in JCS's chain of ownership should have the same effect as the sale of JCS itself.

The Court finds that the SPA's language on this is issue in not ambiguous. The SPA provides that only a sale of JCS's equity or voting power would satisfy the relevant definition of Change of Control Event. Notwithstanding the sale of Davies US's top-level parent, Davies US continuously held the majority of JCS's equity and voting power. The interpretation Plaintiffs suggest disregards the specific form of control referenced in the SPA and replaces it with an abstract notion of control-in-fact. As used in the relevant portion of the SPA, "indirectly" modifies the method by which Davies US sells its control over JCS; but it still requires Davies US to do the selling. Alternatively, the Court finds that, even if find Plaintiffs' interpretation were reasonable, extrinsic evidence definitively refutes Plaintiffs' interpretation of the SPA.

---

[1] Plaintiffs The Johnson Revocable Living Trust, Allen Johnson and Linda Johnson will be collectively referred to as "Plainitffs."

Defendants[2] presented a series of marked-up drafts of the SPA. These drafts show that Plaintiffs repeatedly sought to include JCS's new parents in the definition of Change of Control Event. Davies (as defined below) repeatedly refused to include the proposed changes. For clarity, Davies' counsel left the following note on a near-final draft of the SPA: "Davies is ok with an acceleration of payment upon a change in control of JCS. A change in control of Buyer is not acceptable." The parties did not modify the relevant language after that draft.

The Court finds that Plaintiffs has been unable to refute Defendants' evidence. Accordingly, Plaintiffs have not created a genuine issue of material fact as to whether the parties intended the sale of a JCS parent to trigger the accelerated payment. Thus, summary judgment in Defendants' favor is warranted.

Therefore, and for the reasons stated below, the Court **GRANTS** Defendants' Motion and **DENIES** Plaintiffs' Motion.

## II. RELEVANT FACTS

### A. THE PARTIES

Plaintiff Johnson Revocable Living Trust (the "Trust") is an Oklahoma revocable living trust located in Oklahoma.[3] Plaintiff Allen Johnson is the Trust's trustee and a beneficiary thereof.[4] Plaintiff Linda Johnson is also a beneficiary of the Trust.[5] Both Mr. Johnson and Ms. Johnson are Oklahoma residents.[6]

Defendant Davies US is a Delaware limited liability company authorized to do business in the State of Delaware.[7] Defendant Davies Group Limited ("Davies Group") is an England and

---

[2] Unless otherwise defined, "Defendants" shall mean Davies US and Davies Group Limited
[3] D.I. No. 1, Complaint (hereinafter "Compl.") ¶ 4.
[4] *Id.*
[5] *Id.*
[6] *Id.* ¶¶ 5-6.
[7] *Id.* ¶ 7; D.I. No. 9, Answer to the Complaint (hereinafter "Ans.") ¶ 7.

Wales private limited company with its principal place of business in London, England.[8] Davies Group does business in the State of Delaware.[9] At the relevant times, Davies Group wholly owned Davies US.[10]

Non-party Davies Topco Limited ("Davies Topco" and, together with Davies US and Davies Group, "Davies") is a Jersey private limited company.[11] It is the ultimate parent company of Davies Group through a series of intermediary parent companies.[12]

Non-party BC Partners LLP ("BCP") is a private equity firm based in London, England.[13]

## B. THE STOCK PURCHASE AGREEMENT

Prior to consummation of the SPA, Plaintiffs owned 89.975% of the issued and outstanding shares of capital stock in JCS.[14] Along with the remaining shareholder of JCS, Bryan Scott Johnson (together with Plaintiffs, "Sellers"), Plaintiffs agreed to sell all the outstanding shares of JCS to Davies US.[15] The parties, therefore, entered the SPA on October 30, 2020.[16]

The purchase price was $10,400,000, with "up to" $1,500,000 in "Deferred Consideration."[17] The Deferred Consideration was payable to Sellers subject to contingencies outlined in the SPA.[18] As relevant here, Section 4.22 of the SPA provides:

> In the event that, after the Closing and prior to the second anniversary of the Closing Date . . . [JCS] undergoes a Change of

---

[8] Compl. ¶ 8; Ans. ¶ 8.
[9] Compl. ¶ 8; Ans. ¶ 8.
[10] Compl. ¶ 8; Ans. ¶ 8. According to a chart of the "Davies Group Structure" dated June 12, 2022, Davies US is now the wholly owned subsidiary of Tennessee US Holdco 2, Inc. *See* D.I. No. 88, Exhibit to the Transmittal Affidavit of Elizabeth A. Powers, Esquire in Support of Plaintiffs' Motion for Summary Judgment (hereinafter "Pls.' Ex.") 8. According to that chart, JCS remains the wholly owned subsidiary of Davies US. *Id.*
[11] Compl. ¶ 9; Ans. ¶ 9. Jersey refers to the Island of Jersey, which is part of the English Channel Islands.
[12] Compl. ¶ 9; Ans. ¶ 9.
[13] Compl. ¶ 10; Ans. ¶ 10.
[14] D.I. No. 88, Declaration of Allen Johnson in Support of Plaintiffs' Motion for Summary Judgment ¶ 2.
[15] Pls.' Ex. 1(hereinafter "SPA") at 1.
[16] *See generally* SPA.
[17] *Id.* § 1.3(a).
[18] *Id*. § 1.3(a)(iii).

4

Control Event . . . Buyer shall pay to Sellers an amount equal to the Accelerated Deferred Consideration by wire transfer of immediately available funds to an accounts designated in writing by Sellers . . . . In the event the Accelerated Deferred Consideration is due as a result of a Change of Control Event, such payment shall be due upon the consummation of such Change of Control Event.[19]

The SPA defines "Accelerated Deferred Consideration" as "an amount equal to $1,500,000."[20]

The SPA defines a "Change of Control Event" as:

any of the following, <u>directly or indirectly</u>: (i) a sale, lease, exchange or other transfer (in one transaction or a related series of transactions) of the Business or all or substantially all of [JCS]'s assets; (ii) consummation of a merger or consolidation of [JCS] with or into any other Person (other than an Affiliate of Buyer, provided that such Affiliate assumes Buyer's obligations arising out of this Agreement); or (iii) <u>the sale of 50% or more of the equity ownership or voting power of the then-outstanding capital stock of [JCS]</u> (whether in a single transaction or a related series of transactions) to any single person or "group" (as defined in the Securities Exchange Act of 1934) of Persons; provided, however, that a Change of Control Event shall not include any sale or transfer referenced in (i), (ii) or (iii) above made pursuant to a plan of liquidation, dissolution, merger, consolidation or other reorganization of Buyer under any provisions of federal or state bankruptcy or insolvency Law.[21]

As part of the SPA, Davies Group "irrevocably and unconditionally guarantee[d] . . . the timely and complete performance and payment of all obligations of [Davies US]."[22] The SPA further provided that "[n]o delay or omission to exercise any right, power or remedy" available pursuant to a breach of the SPA would impair the non-breaching party's ability to later exercise such a right.[23] The SPA also contained a typical integration clause.[24]

---

[19] *Id*. § 4.22.
[20] *Id*. § 1.1(c).
[21] *Id*. § 1.1(l) (emphasis added).
[22] *Id*. § 4.19.
[23] *Id*. § 9.9.
[24] *Id*. § 9.10.

## C. THE PURPORTED CHANGE OF CONTROL

The transaction that initiated this controversy was the sale of Davies Topco—JCS's ultimate corporate parent.[25] Davies Topco was owned by a diffuse pool of investors.[26] By February 2020, though, major Davies Topco investors began to plan its sale.[27] In March 2021, an internal Davies email announced that BCP—a separate private equity firm—had "signed a definitive agreement to acquire a majority stake in our business."[28]

PricewaterhouseCoopers LLP prepared a draft "Structure Paper" for BCP in July 2021. The Structure Paper outlined BCP's plan with regard to Davies.[29] The plan, labeled "Project Tennessee," involved a sequence of international transactions to reorganize Davies Topco's presale structure.[30] BCP's acquisition of Davies Topco (the "BCP Purchase") closed on or about August 3, 2021.[31] That same day, the directors of several Davies Topco subsidiaries, including Davies US, submitted their resignations pursuant to the agreement between Davies Topco and BCP.[32] Despite the restructuring, Plaintiffs acknowledge that Davies US remains JCS's "current sole owner."[33]

## D. CURRENT LITIGATION

Following the BCP Purchase, Plaintiffs sent Davies US and Davies Group a letter demanding payment of the Accelerated Deferred Consideration.[34] Plaintiffs claimed the BCP

---

[25] *See* Pls.' Ex. 2.
[26] *See* Pls.' Ex. 4.
[27] D.I. No. 94, Declaration of Matthew Burton in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion (hereinafter "Burton Decl.") ¶¶ 5-6.
[28] D.I. No. 95, Exhibit to the Declaration of Alessandra Glorioso in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion (hereinafter "Defs.' Ex.") 6.
[29] Pls.' Ex. 6.
[30] *Id*. at 10-27.
[31] Compl. ¶ 26; Ans. ¶ 26.
[32] Pls.' Ex. 26.
[33] D.I. No. 88, Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment (hereinafter "Pls.' Mot.) at 1.
[34] Defs.' Ex. 7.

6

Purchase was an indirect sale of more than 50% of JCS's equity ownership or voting power, thus constituting a Change of Control Event and triggering the accelerated payment.[35]

When Defendants did not agree, Plaintiffs filed their Complaint against Defendants on March 23, 2022.[36] They pled three counts: Count I seeks a declaration that the BCP Purchase triggered the payment of the Accelerated Deferred Consideration;[37] Count II alleges breach of contract against Davies US for refusing to pay the Accelerated Deferred Consideration;[38] and Count III alleges breach of guarantee against Davies Group for failing to fulfill Davies US's purported obligations.[39]

On May 25, 2022, Defendants answered the Complaint and contemporaneously moved for judgment on the pleadings.[40] On November 18, 2022, the Court denied Defendants' motion.[41]

Following discovery-related motions,[42] Plaintiffs filed their current Motion for Summary Judgment on July 28, 2023.[43] Defendants opposed the motion and filed their Cross-Motion for Summary Judgment on September 8, 2023.[44] Plaintiffs filed their combined brief in opposition thereto and in further support of their motion on September 22, 2023.[45] On October 13, 2023,

---

[35] *Id.* at 2.
[36] Compl.
[37] *Id.* ¶¶ 32-35.
[38] *Id.* ¶¶ 36-40.
[39] *Id.* ¶¶ 41-46.
[40] Ans.; D.I. No. 10.
[41] D.I. No. 65, Opinion on Defendants' Motion for Judgment on the Pleadings.
[42] *See, e.g.*, D.I. Nos. 76, 77.
[43] Pls.' Mot.
[44] D.I. No. 93, Defendants' Brief in Opposition to Motion for Summary Judgment and in Support of Cross-Motion (hereinafter "Defs.' Mot.).
[45] D.I. No. 96, Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment and Answering Brief in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Pls.' Reply").

Defendants submitted their reply brief.[46]  The Court heard oral argument on December 18, 2023.[47]

### III.  PARTIES' CONTENTIONS

#### A. PLAINTIFFS' MOTION

Plaintiffs' maintains the SPA unambiguously provides that the sale of JCS through "a remote parent of Davies US" constitutes a Change of Control Event that triggers payment of the Accelerated Deferred Compensation.[48]  Plaintiffs cite various sources in support of the proposition that "indirect" means "events occurring with regard to a remote or upstream entity."[49]  Plaintiffs contend that nothing in the SPA suggests a different meaning was intended in Section 1.1(l)'s definition of Change of Control Event, so the term should be interpreted consistently with those sources.[50]  Based on this proffered definition, Plaintiffs conclude that the BCP Purchase was indisputably an indirect sale of JCS.[51]

#### B. DEFENDANTS' MOTION

Defendants claim a Change of Control Event is limited to a change of control over JCS itself.[52]  Defendants note that this did not happen as Davies US owned JCS both before and after the BCP Purchase.[53]  Defendants emphasize that JCS's operations did not change following the BCP Purchase and that Bryan Johnson—who ran JCS—continued to report to the same person.[54]  Defendants also argue, as a corollary to the doctrine of corporate separateness, that the sale of a

---

[46] D.I. No. 98, Defendants' Reply Brief in Further Support of Cross-Motion for Summary Judgment (hereinafter "Defs.' Reply").
[47] D.I. No. 100, Judicial Action Form.
[48] Pls.' Mot. at 14-18.
[49] *Id*. at 15-16.
[50] *Id*. at 17.
[51] *Id*. at 18-19.
[52] Defs. Mot. at 16-20.
[53] *Id.*
[54] *Id*. at 20-21.

parent is distinct from the sale of one of its subsidiaries.[55] Defendants suggest an "indirect" sale could occur where the sale is broken into discrete phases or where "operational control" is transferred to an affiliate without the actual sale of a majority of the equity.[56]

Addressing the issue of ambiguity, Defendants alternatively argue that extrinsic evidence irrefutably proves their interpretation.[57] Defendants principally rely on the SPA's drafting history. That history shows Davies US refusing Sellers repeated attempts to broaden the change of control language to include Davies US and its parent.[58] Defendants assert that Davies US rejected Sellers' proposed expansions specifically with the pending BCP Purchase in mind.[59] Defendants separately argue that Plaintiffs' months-long delay in claiming a Change of Control Event occurred demonstrates that Plaintiffs' current interpretation is a manufactured attempt to obtain an undeserved payment.[60]

## IV. STANDARD OF REVIEW

Under the well-settled summary judgment standard, the Court's role is to determine whether genuine issues of material facts exist, not to decide them.[61] If, however, no genuine issues of material fact emerge from the record and the movant is entitled to judgment as a matter of law, summary judgment will be granted.[62] Summary judgment will not be granted where material disputes of fact exist or where the factual record is insufficiently developed.[63] The

---

[55] *Id*. at 21-27 (first citing *Salomon v. Kroenke Sports & Ent., LLC*, 2019 WL 10631256 (N.D. Tex. Feb. 27, 2019), *aff'd*, 841 Fed. Appx. 737 (5ᵗʰ Cir. 2021); and then citing *Maryville Hotel Assocs. I, LLC v. IHC/Maryville Hotel Corp.*, 2006 WL 1237264 (E.D. Mo. May 5, 2006)).
[56] *Id*. at 25, 27.
[57] *Id*. at 27-30.
[58] *Id.* at 4-10.
[59] *Id.* at 28.
[60] *Id*. at 29-30.
[61] *Genworth Fin., Inc. v. AIG Specialty Ins. Co.*, 2023 WL 6160426, at *8 (Del. Super. Sept. 21, 2023) (citations omitted).
[62] *Id*.
[63] *Id*. (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).

9

moving party has the initial burden of demonstrating its position is supported by undisputed facts.[64] If that burden is carried, the non-moving party is then tasked with showing a material dispute that must be resolved by the fact-finder.[65]

This standard is left unaltered where parties file cross-motions for summary judgment.[66] If neither party argues that there are material factual disputes, "the Court shall deem the motions to be the equivalent of a stipulation for decisions on the merits based on the record submitted with the motions."[67] But, as always, if the Court finds an issue of material fact or believes "a more thorough inquiry into the facts" is warranted, summary judgment will be denied.[68] The Court "evaluates each motion independently" when making these determinations.[69]

## V. DISCUSSION

The dispute here centers on whether the sale of Davies Topco to BCP was "indirectly . . . the sale of 50% or more of the equity ownership or voting power of the then-outstanding capital stock of [JCS] (whether in a single transaction or a related series of transactions) to any single person or 'group' . . . of Persons."[70] The parties appear to agree that if the BCP Purchase satisfies that definition, Section 4.22 would be triggered and Defendants would owe the Accelerated Deferred Payment. The narrow question before the Court at this stage is whether there is a genuine dispute as to whether the BCP Purchase constituted a Change of Control Event.

---

[64] *Id*. (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).
[65] *Id*.
[66] *Id*. (quoting *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Jan. 31, 2019)).
[67] *Id*. (quoting Del. Super. Ct. Civ. R. 56(h)).
[68] *Id*. (citations omitted).
[69] *Id*. (citing *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. June 19, 2017), *aff'd sub nom.*, *Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018)).
[70] SPA § 1.1(l)(iii).

10

"Delaware adheres to the 'objective' theory of contracts."[71] Therefore, "a contract's construction should be that which would be understood by an objective, reasonable third party."[72] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[73]

The contract is unambiguous and there is no place for extrinsic evidence when there is only one reasonable interpretation of a contract.[74] Extrinsic evidence may be used to determine the proper meaning of a contract only when there are multiple reasonable interpretations of that contract.[75] "This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact."[76]

## A. THE SPA'S PLAIN LANGUAGE SUPPORTS DEFENDANTS' INTERPRETATION

The Court does not agree that the BCP Purchase was "indirectly . . . the sale of 50% or more of the equity ownership or voting power of the then-outstanding capital stock of [JCS]."[77] Though the parties focus on the term "indirectly," the Court finds the phrase "equity ownership or voting power of the then-outstanding capital stock" equally important. In short, Plaintiffs' theory rests on a generalized definition of "control" that includes a remote parent's *de facto* ability to influence its subsidiaries' subsidiaries. SPA section 1.1(l)(iii) is not so broad. Rather,

---

[71] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).
[72] *Id.*
[73] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citing *Rhone-Poulenc v. Am. Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992)).
[74] *Id.*
[75] *Id.*
[76] *Id.* at 1232-33.
[77] *See* SPA § 1.1(l).

"ownership" and "voting power" are discrete rights held individually by an entity.[78]  In this regard, Defendants' argument regarding corporate separateness is persuasive.

Delaware's "corporation law is largely built on the idea that the separate legal existence of corporations should be respected."[79]  Inherent in that foundational principle is that assets are not shared across levels of corporate ownership.[80]  Here, Davies US—and only Davies US— holds the equity ownership of, and voting power over, JCS.  If Davies US's parent wanted to influence JCS's operations, it could theoretically do so; but only by directing Davies US to act.  Plaintiffs implicitly treat "indirectly" as modifying how control is *exercised* when, in fact, it only modifies how control is *sold*.

The flaw in Plaintiffs' reading of Section 1.1(l)(iii) can be demonstrated by a hypothetical.  If, as a matter of corporate restructuring, Davies US had sold JCS to Davies Topco, that would unquestionably meet the SPA's definition of a Change of Control Event.  It would be the sale of a majority of the equity ownership of JCS.  Yet, under Plaintiffs' current interpretation, there would be no change in control because Davies Topco would have had control both before and after the transaction.  This hypothetical, but instructive, result counsels against accepting Plaintiffs' interpretation.[81]

---

[78] *See, e.g.*, *Colon v. Bumble, Inc.*, 305 A.3d 352, 362 (Del. Ch. 2023) (noting "the voting power that a stockholder can exercise is subject to the stockholder owning the shares on the record date used to determine the stockholders who can vote").

[79] *Barbey v. Cerego, Inc.*, 2023 WL 6366055, at *9 (Del. Ch. Sept. 29, 2023) (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006)).

[80] *See Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at * 16 (Del. Ch. Jan. 25, 2024) (noting the "corporate veil" must be pieced before a subsidiary's creditor can reach a parent's assets (citing *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012))).

[81] *See Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

Separately, Plaintiffs attempt to bolster their desired interpretation with the presumption of consistent usage.[82] While certain usages of "indirect" pertain to nonconsecutive corporate ownership, it is not consistent. For example, Plaintiffs cite the SPA's definition of "Affiliate."[83] That definition provides in pertinent part, "any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person."[84] Though Plaintiffs claim that helps their position, the Court does not agree. If "indirectly" always means "through one or more intermediaries," then including those terms next to each other necessarily renders one or the other superfluous. Delaware courts seek to avoid that result.[85]

Moreover, the SPA's use of "indirectly" is not limited to the examples Plaintiffs cite. While some examples could align with Plaintiffs' definition, others do not. For instance, SPA section 2.3 provides JCS "does not currently own or control, directly or indirectly, any interest in any other corporation . . . or other business entity."[86] If "indirect" ownership or control was limited to a chain of subsidiaries, it would have been sufficient for Sellers to represent that JCS did not directly own or control another entity. There can be no chain without a first link. Likewise, a representation in SPA section 2.16(f) provides in part, "[t]here are no pending . . . audits, investigations, claims, suits, grievances or other proceedings, and there are no facts that

---

[82] "[T]he presumption of consistent usage . . . provides that 'absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.'" *JJS, Ltd. v. Steelpoint CP Hldgs, LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (quoting *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008)).

[83] Pls.' Mot. at 16.

[84] SPA § 1.1(e).

[85] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023) (explaining that courts interpreting contracts "endeavor 'to give each provision and term effect' and not render any terms 'meaningless or illusory.'" (quoting *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))); *see also NAMA Hldgs.*, 948 A.2d at 419 ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." (citing *Majkowski v. Am. Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del. Ch. 2006))).

[86] SPA § 2.3.

could reasonably give rise thereto, involving, directly or indirectly, any Employee Plan."[87] That provision, and its use of "indirectly," simply has no connection to a succession of subsidiary corporations.

Plaintiffs' interpretation of "indirectly" is unconvincing without the benefit of the presumption of consistent usage. This interpretation would require the Court to look past the specific language of "equity ownership or voting power of the then-outstanding capital stock" and replace it with the more nebulous concept of control-in-fact. The Court is not inclined to believe these sophisticated parties to a carefully negotiated agreement would use technical language when they intended an informal meaning.[88] Accordingly, the plain language of the SPA suggests the parties intended "indirectly" as used in Section 1.1(l) only to modify the way in which Davies US sold its ownership of, or voting power over, JCS.

## B. EXTRINSIC EVIDENCE CONCLUSIVELY ESTABLISHES DEFENDANTS' INTERPRETATION

The intended meaning of "indirectly" in this case is determinable even assuming Plaintiffs' interpretation can meet the threshold of reasonableness. Extrinsic evidence—namely, marked-up drafts of the SPA—demonstrates that Defendants' interpretation was the one mutually agreed upon by the contracting parties. Plaintiffs offer no competing evidence or reasonable inference to genuinely dispute that conclusion. Summary judgment in Defendants' favor is therefore appropriate on this alternative ground.[89]

Davies' counsel sent the first relevant draft of the SPA on September 4, 2020.[90] In that draft, Davies' counsel edited the definition of Change of Control Event to delete "Buyer or

---

[87] *Id.* § 2.16(f).
[88] *See Penton Bus. Media Hldgs., LLC v. Informa PLC*, 2018 WL 3343495, at *12 (Del. Ch. July 9, 2018) ("When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms.").
[89] *Id.* at 1232-33.
[90] Defs.' Ex. 3.

Buyer Parent."[91]  In doing so, Davies specifically excluded the sale of Davies US or Davies Group from the definition of Change of Control Event.  Davies's counsel made the same edit to Section 4.22 of that draft.[92]  The definition of Change of Control Event in the September 4 draft still began with "directly or indirectly."[93]

Sellers' counsel re-inserted the word "Buyer," but not "Buyer Parent," to the definition of Change of Control Event and the relevant portion of Section 4.22 in a draft sent by Sellers' counsel on September 30, 2020.[94]  When Sellers' counsel made those additions, in an apparent attempt at compromise, the Change of Control Event definition included the term "indirectly."[95]  The natural implications are that (1) Sellers wanted to expand the definition of Change of Control Event beyond just JCS and (2) they did not believe "indirectly" already had that effect.

Davies' counsel sent another marked-up draft on October 5, 2020.[96]  As in the September 4 draft, Davies' counsel deleted "Buyer" from the definition of Change of Control Event and the relevant portion of Section 4.22.[97]  Critically, this time Davies' counsel left a highlighted, bold note explaining why.  That note read: "Davies is ok with acceleration of payment upon a change in control of JCS.  A change in control of Buyer is not acceptable."[98]  The relevant provisions of the SPA went unchanged between the October 5, 2020 draft and the final version of the SPA.

In response, Plaintiffs fail to create a genuine dispute as to whether the Change of Control Event definition was intended to encompass upstream sales.  Plaintiffs first argue that it does not make sense that Davies would have made these edits out of concern for the contemplated sale of

---

[91]  *Id*. at DAVIES_00000381.
[92]  *Id*. at DAVIES_00000424.
[93]  *Id*. at DAVIES_00000381.
[94]  Defs.' Ex. 4 at DAVIES_00000009, 00000055
[95]  *Id*. at DAVIES_00000009.
[96]  Defs.' Ex. 5.
[97]  *Id*. at DAVIES_00000161, 00000206.
[98]  *Id*. at DAVIES_00000206 (emphasis omitted).

15

Davies Topco.[99]  According to Plaintiffs, a sale of Davies Topco would only effect Davies US and Davies Group if "indirectly" *did* apply to upstream transactions.[100]  The Court does not agree with that argument for three reasons.

First, it is entirely sensible that, because Davies expected the BCP Purchase, Davies would want to strictly limit the Change of Control Event language.  The Court finds this makes sense, for if "Buyer or Buyer Parent" had been left in that definition, Plaintiffs would use that fact to argue upstream transactions were not excluded.  Second, as the Project Tennessee structure paper shows, Davies US—*i.e.*, "Buyer"—was expected to change control as part of the BCP Purchase.[101]  Third, and perhaps most importantly, Davies' ability to restrict applicable changes in control to JCS itself is not dependent on the strength of their reason for doing so.

Next, Plaintiffs argue that because the words "directly or indirectly" were included in each of the successive drafts, Defendants must not have been concerned about upstream transactions.[102]  In support, Plaintiffs revert to arguing that their interpretation is the only possible meaning of "indirectly."[103]  The Court has already address that issue in Section V.A above.  This argument is also undermined by the repeated edits Davies' counsel made to the drafts and the explicit note in the October 5, 2020 draft, which presumably had some purpose.  The Court finds there is no merit to the suggestion that "indirectly" could refer to sales of entities further removed than Davies US while sales of Davies US itself would be excluded.[104]

Last, Plaintiffs argue that they had no need to explicitly include Davies US or Davies Group in the definition of Change of Control Event because Plaintiffs only cared about a change

---

[99] Pls;' Reply at 15-16.
[100] *Id.*
[101] By at least July 2021, BCP's plan was to transfer Davies US Inc. to "US HoldCo 2."  Pls.' Ex. 6 at 27.
[102] Pls.' Reply at 16-17.
[103] *Id.*
[104] *Id.*

at the top of the corporate tower.[105] Plaintiffs say, for that reason, as long as "indirectly" was included in the definition, Plaintiffs would be satisfied.[106] The Court notes that Sellers conduct does not support this as Sellers repeatedly sought to include "Buyer" in the relevant provisions.

As the Delaware District Court recently reiterated, "[i]f one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended."[107] Here, the Court finds that Plaintiffs knew Davies did not intend for the Accelerated Deferred Compensation to come due upon the sale of a JCS parent. Indeed, Plaintiffs were expressly told as much by Davies.[108]

There is no genuine dispute that Defendants' interpretation of Section 1.1(l)(iii) was the mutually agreed upon meaning. The Court finds that the BCP Purchase was not a Change of Control Event under the SPA. As such, Section 4.22 was not triggered, and the Accelerated Deferred Compensation is not due.

## V. CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion and **GRANTS** Defendants' Motion.

**IT IS SO ORDERED.**

March 7, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     FileAndServeXpress

---

[105] *Id.* at 17-18.
[106] *Id.*
[107] *Bd. of Trs., Plumbers & Pipefitters Local Union No. 74 Pension Fund v. Jones Lang LaSalle Ams., Inc.*, 2023 WL 3884963, at *11 (D. Del. June 8, 2023) (omission in original) (emphasis omitted) (quoting *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775 (3d Cir. 1972)), *appeal docketed*, No. 23-2202 (3rd Cir. July 3, 2023); *see also* 17A C.J.S. *Contracts* § 415 ("A party to a contract generally will be held to that meaning that he or she knew was in accordance with the other party's understanding . . . .")
[108] Defs.' Ex. 5 at DAVIES_00000206.