# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SANJIV MEHRA, individually, and SAMRITA MEHRA, as trustee of the SANJIV MEHRA 2014 IRREVOCABLE TRUST, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0812-KSJM |
| | ) | |
| JONATHAN TELLER, EOS INVESTOR HOLDING COMPANY, LLC, ANGRY ELEPHANT CAPITAL, LLC, ANDREW SALTOUN, as successor trustee of the Teller Children's 2015 Trust, and SARAH SLOVER, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 11, 2024
Date Decided: September 20, 2024

John L. Reed, Peter H. Kyle, Kelly L. Freund, Daniel P. Klusman, DLA PIPER LLP (US), Wilmington, Delaware; Patrick J. Smith, Brian T. Burns, Michael K. Sala, CLARK SMITH VILLAZOR LLP, New York, New York; *Counsel for Plaintiffs Sanjiv Mehra and Samrita Mehra as Trustee of the Sanjiv Mehra 2014 Irrevocable Trust*.

Jon E. Abramczyk, D. McKinley Measley, Elizabeth A. Mullin Stoffer, Kirk C. Andersen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants Jonathan Teller, EOS Investor Holding Company, LLC, Angry Elephant Capital, LLC, and Andrew Saltoun as Successor Trustee of the Teller Children's 2015 Trust, and Sarah Slover*.

**McCORMICK, C.**

This is the second post-trial decision resolving disputes arising from the dissolution of EOS Investing Holding Company ("Holdco" or the "Company"). Before the dissolution, Jonathan Teller and Sanjiv Mehra controlled the Company's membership interests. Teller controlled about 85%, and Mehra controlled the remainder. They had a falling out, and Teller dissolved the Company due to deadlock pursuant to a provision in the governing LLC Agreement (the "2016 LLC Agreement"). Mehra filed this lawsuit challenging the dissolution and asserting claims for breach of fiduciary duty against Teller. The court bifurcated the case to first address Mehra's challenges to the dissolution. In January 2021, the court issued the first post-trial decision, finding that Teller had validly dissolved Holdco but breached the LLC Agreement by failing to replicate Mehra's economic rights at the subsidiary level post-dissolution. Round two of the litigation ensued.

In the second trial, the plaintiffs proved that they are entitled under the 2016 LLC Agreement to have their economic rights replicated at the subsidiary level, which means that they are entitled to share equally in distributions, and that Teller breached this provision in bad faith. Bringing round two to a close, this decision orders specific performance of the economic-rights provision and damages in the amount of distributions that the plaintiffs would have received had that provision been timely honored. It is not a total victory for the plaintiffs, however, because this decision also finds that the plaintiffs have not proven entitlement to declaratory relief or attorneys' fees.

## I. FACTUAL BACKGROUND

The second trial in this action took place over two days. The record comprises 609 trial exhibits, live testimony from two fact witnesses, deposition testimony from two fact witnesses and two expert witnesses, and 31 stipulations of fact.[1] The court also draws from the factual findings of the prior post-trial decision,[2] which are the law of the case.[3] For the most part, this decision does not repeat those findings, but focuses on the additional facts relevant to the remaining claims.

### A. The Company And The Governing Agreements

Before its dissolution, Holdco was part of a collection of entities that operated as "EOS": Holdco, a Delaware LLC; The Kind Group, LLC ("Kind," or the "Kind Group"), a New York LLC; and EOS Products, LLC ("Products"), a New York LLC.[4]

Teller, Mehra, and their affiliated entities owned all of the equity of Holdco. Holdco owned 66.3% of Kind. The remaining 33.7% of Kind's membership interest was owned by Teller, Mehra, an investment vehicle owned by Teller and his mother

---

[1] This decision cites to: C.A. No. 2019-0812-KSJM docket entries by docket ("Dkt.") number; the 2024 trial exhibits (Dkt. 348) (cited by "JX" number); the trial transcript by page and line numbers (Dkts. 346–47) (cited as "Trial Tr."); the transcripts of the depositions of Sanjiv Mehra, Bryan Moser, William Santora, Sarah Slover, and Jonathan Teller (Dkt. 339) (by the deponent's last name and "Dep. Tr."); and the Parties' Joint Pre-Trial Order (Dkt. 329) ("PTO").

[2] *Mehra v. Teller*, 2021 WL 300352, at *2–15 (Del. Ch. Jan. 29, 2021) [*Mehra I*].

[3] *See Carlyle Inv. Mgmt. L.C.C. v. Moonmouth Co. S.A.*, 2015 WL 5278913, at *7 (Del. Ch. Sept. 10, 2015) (holding that the law of the case doctrine "applies to decisions rendered by a court that arise again later in the same court, in the same proceeding— *i.e.*, a ruling at the summary judgment stage that also applies at the post-trial stage").

[4] *Mehra I*, at *2.

called Angry Elephant Capital, LLC ("Angry Elephant"), and various other EOS employees. Kind wholly owned Products, the operating entity.[5]

Teller and Mehra executed Holdco's initial LLC Agreement in 2011 (the "2011 LLC Agreement").[6] The parties amended the LLC Agreement twice, first in 2014 (the "2014 LLC Agreement"), and then again in 2016 through the 2016 LLC Agreement.

Article VII of the 2011 LLC Agreement governed "Distributions, Allocations of Income and Loss," and Section 7.01(a) governed distributions aside from those made to cover tax losses.[7] The 2011 LLC Agreement included language providing that distributions would be made "pro rata in accordance with [Members'] respective Membership Interests" in Kind—approximately 85% to Teller and 15% to Mehra (the "85/15 Split").[8] The 85/15 Split only applied at the Holdco level; Mehra and Teller shared the proceeds from Products equally.[9]

Prior to executing the 2011 LLC Agreement, Mehra and Teller had a "handshake agreement" that they were "equal partners" and that, if Holdco was sold, the parties would share those proceeds 50/50 after the first $100 million.[10] They did not memorialize the handshake agreement in the 2011 LLC Agreement.[11] From 2011

---

[5] *Mehra I,* at *2.

[6] PTO ¶ 50.

[7] JX-9 at 13–16.

[8] *Id.* at 13, 29.

[9] Trial Tr. at 30:10–31:11 (Mehra).

[10] *Id.* at 22:17–23:20 (Mehra).

[11] *Id*. at 27:6–21 (Mehra).

3

to 2014, however, EOS was successful under Mehra's leadership.[12] To incentivize Mehra to stay with EOS,[13] Teller agreed to improve Mehra's economic rights by amending the 2011 LLC Agreement.[14]

Through the 2014 LLC Agreement, the parties amended Section 7.01(a) to require that distributions of proceeds be made based on "Revised Sharing Percentages," a defined term that entitled Teller and Mehra each to roughly half of the distributions (with 1% to Angry Elephant).[15]

The 2014 LLC Agreement included an exception to the equal-sharing scheme. The exception distinguished between "Extraordinary Proceeds" (proceeds from a sale or significant recapitalization) and "Operating Proceeds" (all other proceeds, including profits).[16] The parties agreed that distributions of Extraordinary Proceeds would be made pro rata until the "aggregate [d]istributions of Extraordinary Proceeds to the Members equal $250,000,000."[17] After the first $250 million, Mehra and Teller would share Extraordinary Proceeds equally (reserving 1% for Angry Elephant).[18] Operating Proceeds were not subject to a similar provision and were shared equally between Mehra and Teller (again, with 1% for Angry Elephant).[19]

---

[12] *Id.* at 21:4–13 (Mehra); *id.* at 272:10–19 (Teller).

[13] *Id.* at 272:20–273:12 (Teller).

[14] JX-40 ("2014 LLC Agr."); *see also* Trial Tr. at 21:20–23:20 (Mehra).

[15] 2014 LLC Agr. at 5, 15.

[16] *Id.* at 3–4.

[17] *Id.* § 7.01(a)(iii).

[18] *Id.*

[19] *Id.* § 7.01(a)(ii) & p. 31.

4

By 2016, distributions had increased four-fold.[20] Given the amount already distributed and the business's performance, Mehra engaged in discussions with Teller to "get to full equality" and "clos[e] out the last bits of inequality."[21] Teller acknowledged at trial that Mehra's goal was to address Teller's disproportionate distributions—those made before the 2014 amendments, when all proceeds were subject to the 85/15 split.[22]

The parties agreed to amend the LLC Agreement again. They executed the 2016 LLC Agreement on October 10, 2016, making the amendments effective as of May 26, 2016. The amendments eliminated the distinction between Extraordinary Proceeds and Operating Proceeds and replaced the fixed number, $250,000,000, with a defined term, "Threshold." Through revisions to Section 7.01(a)(ii), the parties agreed that "from and after the time that aggregate Distributions to the Members equal the Threshold, all subsequent Distributions shall be made to the Members in accordance with their respective received sharing percentages as set forth on Exhibit A attached hereto."[23] This decision refers to the Section 7.01(a)(ii) of the 2016 LLC Agreement as the "Equal-Sharing Provision."

The 2016 LLC Agreement provided that Holdco's members must, in the event of dissolution, replicate the Equal-Sharing Provision at the Kind Level. Specially, Section 4.10 provides that members:

---

[20] Trial Tr. at 28:5–11, 32:11–33:13, 30:1–9 (Mehra).

[21] *Id.* at 32:15–33:13, 37:12-38:10, 48:6–11, 172:4–14 (Mehra).

[22] *Id.* at 276:10–18 (Teller).

[23] JX-82 § 7.01(a)(ii); Trial Tr. at 6:6–18 (Mehra); *id.* at 263:24–264:8 (Teller).

5

shall take such actions as are necessary or appropriate to give effect as members of Kind to the economic arrangements among the Members set forth in Section 7.01(a)(ii) (i.e., it is the intent of the Members that, as between such Members, the same distribution provisions shall apply as Members of the Company or as members of Kind).[24]

This decision refers to Section 4.10 as the "Economic-Rights Provision".

Under the 2016 Agreement, the members further agreed, in Section 11.13 governing "Future Assurances,"

to take or cause to be taken such further actions, to execute, acknowledge, deliver and, if necessary, file such further documents and instruments as may be necessary or as may be reasonably requested in order to fully effectuate the purposes, terms and conditions of this Agreement and the transactions contemplated hereby so long as the same is not prohibited by another provision of this Agreement and provided that same is consistent with the terms of this Agreement.[25]

This decision refers to Section 11.13 as the "Future-Assurances Provision".

## B.      Round One of Litigation—The Dissolution Case

In 2016, Mehra and Teller's relationship soured as the Company experienced financial decline.[26]   Teller began to lose confidence in Mehra's management

---

[24] JX-82 § 4.10.

[25] *Id.* § 11.13.

[26] *Mehra I,* at *8.

decisions.[27] By 2019, the Company had experienced four consecutive years of declining performance.[28] Ultimately, Teller decided to cut ties with Mehra.[29]

From September 10 to September 25, 2019, Teller worked to remove Mehra from the Company. For this purpose, he hired a public strategy firm and security guards and engaged with lawyers to form and execute dissolution papers, among other things.[30] At no time did Teller ask his lawyers to implement a plan that would honor Mehra's economic rights at the Kind level.[31]

On September 26, 2019, Teller held a meeting of Holdco's board and proposed a resolution to remove Mehra as CEO of a Holdco subsidiary. Mehra refused to vote on the resolution, and Teller declared the board deadlocked and dissolved Holdco.[32]

Teller distributed the Kind Preferred Interests held by Holdco to its members proportionate to their membership interests (the 85/15 Split) and appointed himself Kind's sole manager. Teller did not replicate Mehra's economic rights at the Kind level as required by the Economic-Rights Provision.[33]

Mehra and affiliated entities ("Plaintiffs") filed this action on October 10, 2019, challenging the dissolution.[34] Plaintiffs amended their complaint on December 13,

---

[27] *Id.* at *9.

[28] *Id.* at *7–8.

[29] *Id.* at *9–12.

[30] *Mehra I,* at *12–14.

[31] *Id.*

[32] *Id.* at *14–15.

[33] *Id.* at *15; Trial Tr. at 17:4–20:1 (Mehra).

[34] Dkt. 1.

2019 (the "Amended Complaint").[35]  The Amended Complaint asserted claims for breach of fiduciary duty and breach of the 2016 LLC Agreement.  Plaintiffs also sought a declaratory judgment invalidating the dissolution of Holdco and enforcing the Economic-Rights Provision.[36]

The Amended Complaint names five defendants: Teller; Holdco; Angry Elephant; Teller's cousin and trustee of the trust holding a portion of Teller's Membership Interests in the Company, Andrew Saltoun; and EOS's General Counsel and Head of Human Resources, Sarah Slover (collectively, "Defendants").[37]

In December 2019, the court ordered an expedited trial on the validity of Holdco's dissolution, bifurcating that issue from the other issues.[38]  The court issued a post-trial opinion in January 2021, finding that the dissolution was valid.[39]

## C. Round Two Of Litigation—The Economic Rights Case

The first post-trial decision also held that Teller was obligated to replicate Mehra's rights at the subsidiary level pursuant to the Economic-Rights Provision. Although the court held that Teller was obligated to honor the Economic-Rights Provision, Teller shirked his obligation to do so.  For example, Teller declined to propose any amendment to Kind's LLC Agreement to implement Plaintiffs' rights, despite arguing that those economic rights cannot be replicated without an

---

[35] Dkt. 58.

[36] *Id.*

[37] *Id.* at ¶¶18–22; *see also Mehra I*, at *15.

[38] Dkt. 52.

[39] *Mehra I*, at *2.

8

amendment.[40]  Teller avoided articulating any view on the economic arrangements until over four years into the case.[41]  Teller also failed to prepare a final accounting as required, citing the lack of one as an excuse for not giving effect to Plaintiffs' rights, while insisting Plaintiffs' records were needed for the accounting even though he controlled the relevant company records.[42]

Teller also attempted to shut down and then dragged out this litigation.[43]  Teller moved to dismiss the claim to enforce the Economic-Rights Provision on jurisdictional grounds, arguing that Kind was a necessary and indispensable party under Court of Chancery Rule 19.[44]  On February 28, 2023, the court denied Teller's motion to dismiss in part.[45]  The court held that neither Kind nor absent Kind members are required parties under Rule 19, and so the court "has the authority to order Teller and his related entities to take action that specifically performs the obligations under the 2016 LLC Agreement, including the Kind LLC Agreement."[46]

The court held that Plaintiffs stated a claim for breach of fiduciary duty and breach of contract.  The court ruled that Plaintiffs' contract and fiduciary duty claims

---

[40] JX-262 at 18–20; Dkt. 330 ("Defs.' Pre-Trial Br."), at 27; JX-265 at 14; Trial Tr. at 248:18–249:22 (Teller).

[41] JX-216 at 10–11; Trial Tr. at 253:1–13, 256:6–15, 258:19–260:16, 261:3-263:18 (Teller); JX-238a at 268:2–269:4, 271:10–14; JX-258 at 6.

[42] JX-82 § 10.04; Trial Tr. at 103:18–104:3 (Mehra); *id.* at 307:19–308:4, 308:13–309:2 (Teller); JX-253 at 6.

[43] *Id.* at 234:21–235:5, 245:5–9, 248:7–12, 248:18–249:22, 250:2-6 (Teller); JX-31 at 1–2.

[44] Dkt. 234.

[45] *Mehra v. Teller*, 2023 WL 2260640, at *1 (Del. Ch. Feb. 28, 2023) [*Mehra II*].

[46] *Id.* at *11.

9

were not duplicative, finding "Teller's knowing failure to honor Plaintiffs' interests above his own is the sort of above-and-beyond bad faith that extends Plaintiffs' fiduciary duty claim past the 'common nucleus of operative facts' that form the basis of their contract claim."[47] The court did grant the motion to dismiss as to Slover for a lack of personal jurisdiction.[48]

Plaintiffs filed their Second Amended Verified Complaint on October 25, 2023.[49] The Second Amended Complaint requests equitable relief, including specific performance of the Economic-Rights Provision.[50] It also requests damages, attorneys' fees, and declaratory judgment that a call option does not supersede the Economic-Rights Provision.

The parties served expert reports in September and November 2023, and trial took place on February 1 and 2, 2024. The court heard oral argument on post-trial briefing on June 11, 2024.[51] This decision resolves Plaintiffs' claims for breach of contract, breach of fiduciary duty, and declaratory relief.

Meanwhile, since dissolution, Teller and his related entities have received $4,738,072 in payments: $780,370 in salary, $16,227 in 401(k) employer-matching payments, $1,396,403 in loan interest on funds advanced to Products, and $2,545,072

---

[47] *Id.* at *11–13.

[48] *Id.* at *14–16.

[49] Dkt. 317.

[50] *Id.* at 35–38.

[51] Dkt. 362; Dkt. 349 ("Pls.' Post-Trial Opening Br."); Dkt. 351 ("Defs.' Post-Trial Answering Brief"); Dkt. 356 (Pls.' Post-Trial Reply Br.").

in advances of legal fees and expenses.[52]  Teller admitted at trial that those salary payments are "Distributions" under the 2016 LLC Agreement and that no provision allows him to take a salary without making corresponding payments to Plaintiffs.[53] In 2022, Teller allocated over $3 million of Kind's income to the Mehra Trust (representing over 49% of all income), and knowingly did not make a tax distribution to the Mehra Trust, yet decided to pay himself interest on funds he advanced to the Company.[54]

## II.    LEGAL ANALYSIS

Plaintiffs claim that Defendants breached the Economic-Rights and Future-Assurances Provisions.  Plaintiffs further claim that Teller breached his fiduciary duties.  They ask the court to order Teller to amend the Kind LLC Agreement to replicate Plaintiffs' economic rights in Holdco at the Kind level.  They seek specific performance, damages, declaratory relief, and attorneys' fees.  Plaintiffs bore the burden of proving their claims beyond a preponderance of the evidence.[55]

### A.    Breach Of The 2016 LLC Agreement

Plaintiffs argue that the Equal-Sharing Provision was triggered before dissolution and that Teller was obligated to replicate those rights at the Kind level.

---

[52] Dkt. 366, Ex. 6 at 26.

[53] Trial Tr. at 239:11–14, 240:1–17 (Teller).

[54] *Id.* at 310:22–312:11 (Teller); JX-535.

[55] *See Reybold Gp., Inc. v. Chemprobe Tech., Inc.,* 721 A.2d 1267, 1269–70 (Del. 1998) ("The plaintiff in a civil suit is required to prove all the elements of its claim by a preponderance of the evidence."); *see also Evans v. Avande, Inc.,* 2011 WL 2092126, at *3 (Del. Ch. June 9, 2022), *aff'd,* 312 A.3d 1155 (Del. 2024) (TABLE).

11

Plaintiffs seek specific performance of the Economic-Rights and Future-Assurances Provisions, specifically asking that the court order Defendants to "execute" and "deliver," as contemplated by the Future-Assurances Provision, an amendment to the Kind LLC Agreement implementing the Equal-Sharing Provision. Plaintiffs also seek damages for the distributions they would have received had Teller timely implemented the Equal-Sharing Provision.

Defendants do not dispute their obligation to replicate Plaintiffs' economic rights at the Kind level.[56] They dispute that the Equal-Sharing Provision was triggered and need be replicated. They say that any amendment made to the Kind LLC Agreement "must specify that any distributions made to Kind's Preferred Members are made in accordance with Section 7.01(a)(ii) of the Holdco Operating Agreement—and not at 50/50" because the Equal-Sharing Provision has not been triggered.[57]

Thus, the parties' contractual dispute centers on two issues: Under what conditions is the Equal-Sharing arrangement triggered and have those conditions been met?

[56] Defs.' Post-Trial Br. at 56 ("As Teller has maintained throughout the entirety of this litigation, once the disputes over the Mehra Trust's economic rights are resolved, he and his related entities will give effect to those rights at the Kind level.").

[57] *Id.* at 56–57.

12

Under Delaware law, courts enforce a contract's plain language unless it is ambiguous.[58] The court must not read ambiguity into a contract where none exists.[59] "[A] contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[60] "[A]mbiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[61]

Alternative entity disputes amplify these contractarian principles. As the Delaware Supreme Court recently stated in *Cantor Fitzgerald, L.P. v. Ainslie,* when interpreting a limited partnership agreement, "[t]he courts of this State hold freedom of contract in high—some might say, reverential—regard."[62] "Only a strong showing

---

[58] *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *4 (Del. Ch. Apr. 8, 2019) (citing *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004906, at *3 (Del. Super. Aug. 17, 2015) ("Absent any ambiguity, the Court should interpret a contract in accordance with the plain meaning of language in the document.") (citations omitted)), *aff'd*, 276 A.3d 463 (Del. 2022); *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007) ("[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms 'establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'" (quoting *Multi–Fineline Electronix, Inc. v. WBL Corp.*, 2007 WL 431050, at *6 (Del. Ch. Feb. 2, 2007) (citing *Eagle Indus.*, 702 A.2d at 1232), *aff'd*, 945 A.2d 594 (Del. 2008)).

[59] *NASDI Hldgs.*, 2019 WL 1515153, at *4 (citing *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001)) ("[C]reating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.").

[60] *Id.* (quoting *O'Brien*, 785 A.2d at 288).

[61] *Id.* (internal quotations omitted).

[62] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676 (Del. 2024).

that dishonoring a contract is required to vindicate a public policy interest even stronger than freedom of contract will induce our courts to ignore unambiguous contractual undertakings."[63]

### 1. When Is Equal-Sharing Triggered?

The Equal-Sharing Provision establishes the following test for determining when the Equal-Sharing arrangement takes hold (the "Equal-Sharing Trigger"):

> [F]rom and after the time that aggregate Distributions to the Members equal the Threshold, all subsequent Distributions shall be made of the Members in accordance with their respective revised sharing percentages . . . .

Expressed as a formula, where "aggregate Distributions" is represented as a variable, "D", Equal-Sharing takes hold when:

$$D \geq \text{Threshold}$$

The 2016 LLC Agreement defines Threshold as follows:

> At the time of any Distribution, \$188,767,785 less the sum of all Distributions made by the Company to the Members between July 29, 2014 and the time of such Distribution.[64]

Representing the "sum of all Distributions made after July 29, 2014" a variable, "d", the Threshold formula is:

$$\text{Threshold} = \$188,767,785 - d$$

Substituting the Threshold formula for "Threshold" in the Equal-Sharing Trigger, Equal Sharing takes hold when:

$$D \geq \$188,767,785 - d$$

---

[63] *Id.* at 676–77 (cleaned up).

[64] JX-82 § 1.01 at SM-000089.

The phrase "aggregate Distribution" plays a key role in the Equal-Sharing Trigger. The 2016 LLC Agreement defines "Distributions," but it does not define "aggregate Distributions," and the parties dispute the meaning of the phrase.

Plaintiffs argue that "aggregate Distributions" refers to all Company Distributions ever made. They rely primarily on the lack of any limiting language on the term "aggregate." They note that the definition of Threshold is temporally limited to Distributions between July 29, 2014, and the date of the distribution. But the phrase "aggregate Distributions" contains no temporal limitations. From this, Plaintiffs infer that there are no temporal limitations on the phrase, and "aggregate" means the combination of all Distributions. More precisely, Plaintiffs define "D" as all transactions that fall within the definition of Distribution dating back to before July 29, 2014 ("b") when the Company was formed and extending after the date relevant to the Threshold, July 29, 2014 ("d"). Expressed as a formula,

$$D = b + d.$$

Substituting "b + d" for "D" in the Equal-Sharing Trigger means that Equal Sharing takes hold, in Plaintiffs' view, when:

$$b + d \geq \$188,767,785 - d$$

Simplified, Plaintiffs' interpretation of the Equal-Sharing Trigger is:

$$b + 2d \geq \$188,767,785$$

Defendants seek to impose a limitation on the aggregation principle of the Equal-Sharing Trigger. They imply a limitation found in the Threshold definition, interpreting the Equal-Sharing Trigger to be activated once the sum of all

15

distributions made *after* July 29, 2014, equals $188,767,785. The Threshold, in Defendants' view, is a fixed number—$188,767,785.

Of the parties' competing interpretations, only Plaintiffs' interpretation is faithful to the plain language of the 2016 LLC Agreement. Contrary to Defendants' view, the Threshold is not defined as a fixed number, $188,767,785. Rather, it is defined as a formula. And the introductory clause, "at the time of any Distribution," suggests that the formula might yield different results depending on the time it is applied. Moreover, had the parties wished to equate "aggregate Distributions" with "the sum of all Distributions made . . . between July 29, 2014 and the time of such Distribution," they could have done so. Instead, the parties defined the trigger as when "aggregate Distributions" achieve the Threshold.

Defendants do not deny that the plain language of the 2016 LLC Agreement supports Plaintiffs' position and contradicts theirs. They instead argue that the court should not interpret the Equal-Sharing Provision in accordance with its plain language because doing so would violate the interpretive canon requiring that the court avoid an "absurd result" that "no reasonable person would have accepted when entering into the contract."[65] They say that Plaintiffs' interpretation leads to an absurd result in two ways.

First, Defendants argue that Plaintiffs' interpretation could result in Equal Sharing as of April 2016, before the 2016 LLC Agreement was executed or made effective. It is counterintuitive, they say, to include a complicated formula for

---

[65] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (cleaned up).

determining when an event is to occur when that event already occurred. But the reality is that the parties might not have focused on the amount of distributions to date at the time they executed the 2016 LLC Agreement. And there is no legal bar to agreeing to a trigger that occurred before they executed the contract. Indeed, the definition of Threshold contemplates a historical calculation reaching back in time prior to the agreement's effective date. So, the fact that Plaintiffs' expert's calculation resulted in a trigger date in April 2016 does not suggest any absurdity. This is not a reason to disregard the unambiguous language of the agreement.

Second, Defendants note that Plaintiffs' interpretation double counts Distributions made after July 29, 2014 (b + **2d** = $188,767,785), making it easier to achieve the Equal-Sharing Trigger. A simple hypothetical illustrates the double-counting criticism. Let's simplify the fixed number by substituting $188,767,785 for $200,000,000 in the Equal-Sharing Trigger. Assume that the Company intends to make a distribution of $50,000,000 on July 30, 2014. Assume further that the Company distributed $100,000,000 before that date. Under Defendants' approach, one adds $100,000,000 and $50,000,000 to reach $150,000,000. Because the result is less than $200,000,000, the July 30 distribution does not trigger Equal Sharing. Plaintiffs, by contrast, add $100,000,000 and (**2 x** $50,000,000) to reach the fixed number of $200,000,000, which triggers Equal Sharing. This is so although Defendants did not actually receive $200,000,000 in Distributions. They only received $150,000,000. According to Defendants, they never would have agreed to that.

Defendants support this conclusion with extrinsic evidence. Teller recalls that he and Mehra originally agreed that Equal Sharing would be triggered when distributions of Extraordinary Proceeds on a sale of the Company exceeded a certain threshold—originally $250 million—based on a Benchmark value of the Kind Group at that time.[66] In 2016, the parties agreed that both Extraordinary Proceeds and Operating Proceeds would count towards the Threshold, which was good for Mehra. At the same time, they agreed to a new benchmark value of $275 million, which was good for Teller. The revised Benchmark of $275 million would result in $204,067,785 flowing to Holdco on a sale of the company, which became the new threshold amount in the correction to the 2014 LLC Agreement.[67] Subtracting distributions to the Teller Entities made before July 29, 2014, resulted in the $188,767,785 Threshold in the 2016 LLC Agreement.[68]

---

[66] 2014 LLC Agr. § 7.01(a)(iii); JX-23.

[67] JX-54; JX-54a; JX-90b.

[68] Mehra 2023 Dep. Tr. at 90:2–91:4. Defendants also support their argument with language from the court's prior decisions describing the Equal-Sharing Provision. *See Mehra I,* at \*4 ("The 2016 LLC Agreement eliminates the distinction between ordinary proceeds and Extraordinary Proceeds and provides that all proceeds be distributed proportionate to the parties' Membership Interests until distributions in the aggregate (dating back to July 29, 2014, the date of the LLC Agreement) hit a threshold of approximately $190 million."); *Mehra II,* at \*2 ("Under this section, Teller and Mehra's respective distribution percentages were initially proportionate to their membership interests – 85% and 15% respectively. Once the aggregate distributions reached a threshold of $190 million (the "Threshold"), the percentages changed. Past the Threshold, the distributions would be governed by an "Equal Distribution Arrangement" outlined in the Holdco LLC Agreement."). From these statements— which are not clear endorsements of Defendants' interpretation—Defendants argue that *the court* interpreted the Equal-Sharing Provision to impose a July 29, 2014 cut-off on aggregate Distributions. The reality is, however, that this issue was not previously litigated. When describing the drafting history of the LLC Agreement for

The problem with Defendants' second argument is that the double-counting approach is not inherently absurd. Rational negotiators could decide to double count categories of Distribution in order to hasten Equal Sharing. That the formula achieves its goals quickly does not merit eschewing the plain reading of the contract. The result only seems off—like something that Teller would not reasonably accept— if the court looks to extrinsic evidence. But the court cannot look to extrinsic evidence where, as here, the contract is unambiguous.[69] This is not the "strong showing" that the high court said is required in *Cantor Fitzgerald*.[70] Accordingly, the plain language of the 2016 LLC Agreement governs.

Plaintiffs, therefore, are correct. Equal Sharing takes hold when:

$$b + 2d \geq \$188{,}767{,}785$$

### 2. Has Equal Sharing Been Triggered?

Whether Equal Sharing has been triggered depends on the total distributions before and after July 29, 2014. The 2016 LLC Agreement defines Distributions as any "distributions of cash or other assets of the Company, including distributions of (i) Available Cash and (ii) any payments made by the Company or any of its

---

factual context, the court did not make findings concerning the meaning of the provision. Defendants reach too far to suggest otherwise.

[69] *See, e.g., GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (noting that "the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language"); *Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, at *11 (Del. Ch. Aug. 13, 2018) ("Because the scope of Article VII is plain and unambiguous, principles of contract interpretation foreclose consideration of extrinsic evidence.").

[70] *Cantor Fitzgerald*, 312 A.3d at 676–77.

19

Subsidiaries to any Member as salary or pursuant to any consulting or other agreement with such Member."[71] The parties disagree on whether several categories of payments are appropriately included in this definition.

### a.      Pre-July 29 Distributions

The parties dispute whether $57.2 million of distributions made before July 29, 2014, should be included in the calculation of "aggregate Distributions."[72]  As discussed above, the definition of "aggregate Distributions" includes distributions made before July 29, 2014 (the "b").  Plaintiffs are correct, Pre-July Distributions are included.

### b.      Payments to Purvas

The parties dispute whether $19.7 million in payments made to Mehra for consulting services through his company, Purvas, Inc., constitute Distributions. Purvas was not a member of Holdco.[73]  For this reason, Defendants argue that the payments to Purvas should not be included in the definition of "Distribution," which includes only payments made to a "Member."  It is fair to hold Plaintiffs to a literal reading of the 2016 LLC Agreement given their plain-language argument concerning the Equal-Sharing Trigger.  So, Defendants win this one.  The Purvas payments are not included in the aggregate Distributions.

---

[71] JX-82 at 9.

[72] Pls.' Post-Trial Opening Br. at 11; Defs.' Post-Trial Answering Br. at 35.

[73] Defs.' Post-Trial Answering Br. at 36.

### c. Transfer Of Preferred Interests Upon Dissolution

The parties dispute whether the Preferred Interests that Holdco held in Kind, which Teller distributed to Holdco Members at dissolution on September 26, 2019, should count toward "d." Plaintiffs value the Preferred Interests at about $45 million, and Defendants do not dispute that valuation, estimating the value may be up to $69 million.[74]

On its face, the Preferred Interests fall within the definition of Distributions. The 2016 LLC Agreement defines Distributions to include "distributions of cash *or other assets* of the Company."[75] The Preferred Interests in Kind were "assets" of Holdco.[76] And they were distributed to Holdco's members.[77]

Defendants advance two arguments for excluding the Preferred Interests from the aggregate Distributions.

First, they argue that the Preferred Interests are not governed by the Equal-Sharing Provision; rather, they are governed exclusively by Section 4.10, which directs that distributions of Company assets made upon deadlock-based dissolution, including distribution of "the membership interests of Kind then held by the

---

[74] Plaintiffs' expert, Bryan Moser, valued these interests at about $45 million. Trial Tr. at 348:15–349:7 (Moser). Teller said that was "approximately" correct. *Id.* at 319:6–10 (Teller). Defense expert William Santora valued them at a minimum $69 million. *Id.* at 436:14–437:2 (Santora).

[75] JX-82 at 9 (emphasis added).

[76] *Id.* at § 4.10 (expressly describing the "membership interests of Kind" as "Company assets").

[77] Trial Tr. at 322:15–20 (Teller) (confirming broad definition of asset); *see also* JX-421 at 3, 6, 12 (The 2019 Holdco K-1s to members, which Teller authorized, describe the transfers as "distribution[s] of Kind Group ownership.").

Company," shall be made "pro rata in accordance with their respective Membership Interests[.]"[78]

Defendants interpret the express call-out of the Preferred Interests in Section 4.10 as an implied carve-out to the Equal-Sharing Provision of Section 7.01 for the Preferred Interests. As they put it, "the 2016 [LLC Agreement] contains two different provisions: (1) one for distributions made in the ordinary course [§ 7.01]; and (2) one for distributions made upon dissolution resulting from a deadlock [§ 4.10]."[79] The former requires that "Distributions . . . be made pro rata in certain circumstances and not pro rata in others;" the latter requires pro rata distribution of the Preferred Interests.[80] From this contractual structure, Defendants argue that distributions made pursuant to Section 4.10 should not be counted toward the Equal-Sharing Trigger.

Although Defendants correctly describe the contractual structure, that structure does not necessarily impliedly result in the carve-out they seek. Defendants do not argue why the court must draw this conclusion from the structure of the 2016 LLC Agreement, or why it is imperative to exclude certain distributions from the "aggregate Distributions" at issue in the Equal-Sharing Provision. Lacking any rational explanation, the court refuses to draw Defendants' conclusion.

---

[78] JX-82 § 4.10.

[79] Defs.' Post-Trial Answering Br. at 37.

[80] *Id.* at 38.

Second, Defendants argue that Teller and his entities did not gain any additional economic value by the transfer of the Preferred Interests because the distribution of the Preferred Interests was just a transfer from one entity to another. "It was not a 'Distribution' because it did not result in any proceeds or payment . . . from Holdco to its Members."[81] This argument misses the fact that the Preferred Interests transferred direct ownership of an asset and was, at base, a plain "Distribution" of "an asset."

So, Plaintiffs win this point. The Preferred Interests constitute Distributions valued at $45 million in accordance with Plaintiff's expert calculation.[82]

### d. Interest On Loan Agreements

The parties dispute whether interest on loan agreements made by Teller to Products constitute a distribution. Between 2018 and July 7, 2023, Teller and Angry Elephant received about $1.42 million in interest payments, and Mehra received $27,000.[83]

The 2016 LLC Agreement's broad definition of Distributions includes payments made to any Member pursuant to "any . . . other agreement" with a member.[84] The loan agreements under which interest was paid to Teller and his entity are "other agreement[s]" with Members. The "Distributions" definition was

---

[81] Defs.' Post-Trial Answering Br. at 39.

[82] JX-532 ¶ 39; JX-247 at 7; Trial Tr. at 348:15–349:7 (Moser).

[83] JX-134; JX-134a; JX-358; JX-407; JX-140; JX-137; JX-534 at 30 (rows 664–65); JX-370.

[84] JX-82 at 9.

intended to "capture any . . . forms of agreements that we had with these companies to take money from the businesses."[85]

The interest payments are akin to a salary, bonus, or other compensation because they involve a "give and a get"—the members provided loans to the Company and received interest income in return for their performance in making those loans available.

So, Plaintiffs again win the point. The interest payments on the Members' loan agreements are Distributions.

### e. Legal Fees And Indemnification Expenses

The parties dispute whether payments made for Defendants' legal fees count as distributions. Although the definition of Distributions broadly refers to payments to any member under "any consulting or other agreement" with a member, interpreting that language to include payments made in satisfaction of the Company's mandatory advancement and indemnification obligations would go too far.

Unlike compensation paid to a member for services rendered to the Company, the advancement of legal fees and expenses is paid to satisfy a distinct legal entitlement. These payments are more akin to the Company's fulfillment of a pre-existing, independent obligation rather than a distribution of assets to a member.

So, Defendants prevail on this issue. Legal fees and expenses advanced to Teller are thus not Distributions for purposes of calculating the Threshold.

---

[85] Trial Tr. at 11:11–22 (Mehra).

### f.    Conceded Payments

There are three further payments that Plaintiffs argue should count as Distributions: payments from Kind to Mehra and Teller; payments to Teller's mother through Angry Elephant; payments from Holdco to taxing authorities. Defendants concede these points by not addressing them in their post-trial answering brief.[86] Defendants also agree that all salary and 401(k) payments count as Distributions.[87]

### g.    Conclusion As To Payments

The payments to Purvas and legal fees and expenses advanced to Teller do not constitute Distributions and are excluded from aggregate Distributions.[88] Distributions include: (i) pre-July 29 Distributions of $57,200,000; (ii) the transfer of Preferred Interests upon dissolution, valued at $45,505,080; (iii) interest on loan agreements of $1,451,729; (iv) payments from Kind to Teller and Mehra of $428,556; (v) payment to Angry Elephant of $1,981,809; (vi) payments to taxing authorities, $636,421; and (vii) the salary payments and 401(k) payments.

The parties are ordered to confer, without waiver of any appellate arguments, to implement the court's findings into their expert models for the purpose of applying the Equal-Sharing Trigger.

---

[86] *SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 n.71 (Del. Ch. June 16, 2009) ("[Defendant] did not address those claims in post-trial briefing, and they are waived.").

[87] *See* Pls.' Opening Post-Trial Br. at 54; *see also* Trial Tr. at 239:11–14, 240:3–17 (Teller).

[88] Because of these findings, the court need not reach Plaintiffs' acquiescence arguments. *See* Pls.' Post-Trial Opening Br. at 51–53.

## B. Breach Of Fiduciary Duty

Plaintiffs argue that Teller and his affiliated entities breached their fiduciary duties by failing to replicate Mehra's economic rights. They also contend that Teller engaged in a campaign to delay and avoided honoring Plaintiffs' economic rights from the period from before Holdco's dissolution through the present.[89] Plaintiffs seek damages for the breach of fiduciary duty, pre-judgment interest, declaratory judgment on an issue relating to a call option, and attorneys' fees.

By default, managers of limited liability companies owe fiduciary duties akin to those owed by directors of a corporation.[90] Teller owed Mehra and the members of Holdco a duty of loyalty, which "mandates that the best interest" of Holdco and its owners "takes precedence over any interest" he may have possessed personally.[91]

Under Delaware law, a plaintiff can show bad faith by proving that a fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation," intentionally "acts with the intent to violate applicable positive law," or "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[92]

---

[89] *Id.* at 57–60.

[90] 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties . . . shall govern.").

[91] *Triple H Fam. Ltd. P'ship v. Neal*, 2018 WL 3650242, at *18 (Del. Ch. July 31, 2018), *aff'd sub nom. Neal v. Triple H Fam. Ltd. P'ship,* 208 A.3d 703 (Del. 2019) (TABLE) ("[T]he traditional duties of loyalty and care . . . are owed by managers of Delaware LLCs…in the absence of a contractual provision waiving or modifying those duties.") (citations omitted).

[92] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

Plaintiffs have proven that Teller breached his fiduciary duties. In 2019, when Plaintiffs told Teller that the Equal Sharing arrangement was in operation, Teller did not question or dispute this assertion despite supposedly disagreeing with it. But leading up to dissolution, Teller did not ask his lawyers for a plan to implement Mehra's economic rights. On the day of dissolution, Teller did not address the economic issues and instead sent his staff to tell Mehra that all they had was a 15% ownership interest. In the weeks following the dissolution, Teller made no effort to address the Economic Rights. Post-dissolution, Teller unilaterally distributed to himself funds, in the form of salary payments and loan interest, without making corresponding payments to Plaintiffs. Similarly, in 2022, Teller allocated substantial taxable income to Plaintiffs without making a corresponding tax distribution to Plaintiffs as required.

Teller's conduct both before and during this litigation amounts to the type of "intentional dereliction of duty" and "conscious disregard" for one's responsibilities that constitutes bad faith.[93]

Defendants did not respond to many of these points. They do bring up Teller's efforts to reach a consensual resolution by proposed mediation and alternative dispute resolution processes.[94] Trying to mediate and resolve a case is not a defense to a claim for breach of fiduciary duties. Teller is liable for breaching his fiduciary duties.

---

[93] *Id*. at 62.

[94] Defs.' Post-Trial Answering Br. at 45.

## C. Remedies

Plaintiffs seek specific performance, damages, pre-judgment interest on the damages award, declaratory relief, and attorneys' fees.

### 1. Plaintiffs Are Entitled To Specific Performance.

Defendants do not dispute that Plaintiffs are entitled to specific performance of the Economic-Rights and Further-Assurances Provisions of the 2016 LLC Agreement. Plaintiffs' request for specific performance is granted.

### 2. Plaintiffs Are Entitled To Damages And Pre-Judgment Interest.

Plaintiffs are entitled to damages and pre-judgment interest for proving breach of the 2016 LLC Agreement and breach of fiduciary duties. They are not entitled to double recovery. Plaintiffs' damages for both claims consist of the amount of Distributions owed to Mehra from the date that the Threshold was met. The parties shall submit a form of order determining this figure based on the court's findings.

The judgment shall include pre-judgment interest at the statutory rate, running from the date of each Distribution, with the "rate of interest fluctuating with changes in the legal rate."[95] Given that Teller benefitted from not paying Plaintiffs and delaying their recovery, an award of pre-judgment interest is particularly appropriate.

Defendants have raised a number of arguments to avoid liability. They argue that relief against them affects Products and Kind, who they say are necessary

---

[95] *Domain Assocs., L.L.C.*, 2018 WL 3853531, at *20.

parties, and over whom the court lacks jurisdiction.[96]  Defendants contend that the amounts Teller received after dissolution were owed to him independently by Kind and Products for services performed.  So, requiring Teller to pay those amounts to Plaintiffs would leave Teller with an unmet claim against Products or Kind for those payments, forcing those entities to make Teller whole even though they are not subject to this court's jurisdiction.

Defendants seek to complicate a straightforward issue.  They are subject to this court's jurisdiction.  They breached their contractual and fiduciary duties to Plaintiffs.  They are liable for doing so.  It is that simple.  The court goes no further and imposes no obligations or liability on Products or Kind.

### 3.    Plaintiffs Are Not Entitled To Declaratory Relief.

Plaintiffs seek declaratory relief with respect to the Call Option in the Kind LLC Agreement (the "Call Option").  Section 11.8 of the Kind LLC Agreement gives Kind the right to repurchase member interests at a pre-determined price.[97]  Plaintiffs note that there is no call option in the 2016 LLC Agreement, and so replicating Plaintiffs' economic rights at the Kind level requires eliminating that provision.  Plaintiffs do not allege that Defendants have invoked the Call Option.  But they note that, in theory, the Call Option could permit Teller to attempt to repurchase Plaintiffs' Kind interests at a price that disadvantages Plaintiffs.

---

[96] Defs.' Post-Trial Br. at 53–55.

[97] JX-61 § 11.8.

Plaintiffs have not demonstrated that they are entitled to this relief. The dispute is only theoretical at this stage, and this court avoids resolving hypothetical disputes.[98] Moreover, Mehra's request for a declaration as to the Call Option affects the rights of Kind—the only party that can exercise the Call Option—and Kind is not a party to these proceedings.

### 4. Plaintiffs Are Not Entitled To Attorneys' Fees.

This court has discretion to shift attorneys' fees and costs when a party to the litigation has acted in bad faith.[99] The bad faith exception to the American rule, provides that "attorneys' fees may be awarded if it is shown that the defendant's conduct forced the plaintiff to file suit to secure a clearly defined and established right."[100] "The court does not shift fees lightly."[101] And the circumstances do not warrant fee shifting here.

## III. CONCLUSION

For these reasons, the court finds for Plaintiffs on their claims for breach of contract and breach of fiduciary duties. The parties are instructed to confer on a form of amendment to the Kind LLC Agreement that effectuates this outcome, calculate

---

[98] *See, e.g., In re Aristotle Corp,* 2012 WL 70654, at *3 (Del. Ch. Jan. 10, 2012) (noting that the "[Delaware] Supreme Court has warned trial courts against the dangers of advisory opinions" where "there is no legitimate need . . . to determine" the issue).

[99] *Barrows v. Bowen,* 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994).

[100] *McGown v. Empress Ent., Inc.,* 791 A.2d 1, 4 (Del. Ch. 2000); *see also Abex Inc. v. Koll Real Estate Gp., Inc.,* 1994 WL 728827, at *20 (Del. Ch. Dec. 22, 1994) ("Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right, are evidence of bad faith.") (citing *Judge v. City of Rehoboth Beach,* 1994 WL 198700, at *2 (Del. Ch. Apr. 29, 1994)).

[101] *Kuramo,* 2024 WL 1888216, at n.440.

the resulting damages based on the court's findings, and submit a form of order implementing this decision within three weeks.  If the parties cannot agree on a form of order, the parties must submit competing forms within three weeks.